NATIONAL BANK OF COMMERCE OF DALLAS, Plaintiff-Appellant,

v.

ALL AMERICAN ASSURANCE COMPANY et al., Defendants-Appellees.

No. 76–3331.

United States Court of Appeals, Fifth Circuit.

Nov. 14, 1978.

D. Ronald Reneker, Michael E. Rohde, Steven F. Bright, Dallas, Tex., for plaintiff-appellant.

Mary Joe Carroll, Austin, Tex., for All American Assur.

Phillip N. Smith, Jr., Dallas, Tex., for Herman Taylor.

Fletcher L. Yarbrough, Dallas, Tex., for Gary Anderson, Jr.

John O. Jones, Dallas, Tex., for defendants-appellees.

George C. McIngvale, Sr., pro se.

Before THORNBERRY, RONEY and HILL, Circuit Judges.

RONEY, Circuit Judge:

In this case, plaintiff bank sought to recover from defendant-borrowers $1.45 million in damages resulting from alleged fraud in the pledge of worthless stock, asserting a violation of the antifraud provisions of the federal securities acts. 15 U.S. C.A. § 78j(b); 15 U.S.C.A. § 77q(a). Holding that a commercial loan on a promissory note with securities pledged as collateral is not a protected security transaction under the federal antifraud statute, we affirm the district court's dismissal for lack of federal jurisdiction.

### Background

The transactions which lead to this action centered around McIngvale Associates General Agency, Inc. ["Associates"], and its subsidiaries, Mobile Insurance Company and Mobile County Mutual Insurance Company. Associates and its subsidiaries were engaged in the sale and brokerage of insurance, subject to regulation by the Texas Insurance Board and Commissioner.

By the fall of 1973, the Board had determined the companies' capitalization to be insufficient. Two million dollars of new capital was required. Failure to comply would result in a termination of the rights of the companies to do business, thereby destroying the value of Associates.

Searching for a solution to this difficulty, George C. McIngvale, Sr., the owner of almost 90% of Associates' stock, was approached by Messrs. Anderson, Taylor, and Thibaut who were interested in purchasing Associates. The three controlled All American Assurance Company ["All Amercian"] and intended to use Associates to generate business for their company.

There were several obstacles to the transaction. Primarily, it was necessary to infuse the required capital into Associates.

An additional difficulty stemmed from the fact that McIngvale's stock was pledged to the National Bank of Commerce ["National Bank"], of which he was a director, as partial security for a $2 million loan to Associates. National Bank would not release the stock unless the debt which it secured was refinanced.

In order to resolve these difficulties, the principals arranged for National Bank to advance $2.25 million to McIngvale in exchange for a promissory note executed by McIngvale and a pledge of 2,250,000 shares of newly created Class B common stock of Associates. The advance by National Bank to McIngvale was transferred to Associates' account as the ostensible purchase price of the Class B stock. The pledged Class B stock was issued, however, without authorization of Associates' Board of Directors and was worthless.

In the meantime, All American issued a commitment to purchase from Associates debentures having ten-year maturities to be issued by Associates every six months, five $400,000 debentures and a final one in the amount of $250,000. After these agreements were put into effect, the Texas Insurance Board and Commissioner approved the proposed sale and it was consummated.

Subsequently, however, the financial position of Associates continued to deteriorate and in 1975, it was placed in liquidation and, in separate proceedings, adjudicated a bankrupt. National Bank, of course, never foreclosed upon the unauthorized Associates stock and suffered a loss of $1,450,000 on its loan to McIngvale, $800,000 of the loan having been repaid prior to default.

Alleging fraud, National Bank subsequently brought this action against defendants under the antifraud provisions of the federal securities acts, section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a),[1] section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b),[2] and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1977), promulgated thereunder.[3]

For the purposes of the motion to dismiss for lack of jurisdiction, the well pleaded allegations of National Bank are accepted as true. *Spector v. L Q Motor Inns, Inc.,* 517 F.2d 278, 281–282 (5th Cir.

---

1. 15 U.S.C.A. § 77q(a) provides:

   **§ 77q. Fraudulent interstate transactions**

   (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

   (1) to employ any device, scheme, or artifice to defraud, or

   (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

2. 15 U.S.C.A. § 78j(b) provides:

   **§ 78j. Manipulative and deceptive devices**

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   . . . . .

   (b) To use or employ, in connection with the purchase or sale of any security regis-

   tered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1978), provides:

   **§ 240.10b–5 Employment of manipulative and deceptive devices.**

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interestate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 786, 46 L.Ed.2d 644 (1976).

■ Because diversity of citizenship is absent, federal jurisdiction must be based upon a violation of the federal securities laws. In order to establish the necessary jurisdictional basis, National Bank must show the complaint falls within the scope of the antifraud provisions of the securities acts. In order to do so, National Bank must demonstrate, among other things, that there has been a "purchase" or "sale" of a "security."

■ Although there are slight differences in wording between the 1933 Securities Act and the 1934 Securities Exchange Act, the definitions of these terms are functionally equivalent and are for the purposes of this case so treated.[4] *See, e. g., SEC v. Continental Commodities Corp.,* 497 F.2d 516, 523 (5th Cir. 1974); *McClure v. First National Bank,* 497 F.2d 490, 493 n. 1 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).

National Bank asserts two theories: first, it argues that the pledge of stock as collateral for the loan constituted a "purchase" of a security by the bank within the meaning of the acts; second, it maintains that the note signed by McIngvale for the loan is a "security" within the meaning of the acts.

I. *The Pledge of Stock as a "Purchase"*

■ Both the 1933 and 1934 Acts require a "purchase" of stock in order to trigger operation of their antifraud provisions. To invoke federal jurisdiction under the pledge theory, National Bank must demonstrate that the pledge of Associates stock as collateral for the loan to McIngvale, the owner of the stock, was a "purchase."

This Court has recently held that the mere pledge of a security as collateral for a loan evidenced by a promissory note does not constitute a purchase within the meaning of the securities acts. *Reid v. Hughes,* 578 F.2d 634, 638 (5th Cir. 1978). The Court said:

> While it may be true that in certain situations a certificate of deposit can be a security as that term is used in the Act, there is absolutely no support for the proposition that a mere *pledge* of a security in circumstances such as those alleged here would constitute a purchase or sale thereof within the meaning of Section 10(b) and Rule 10b–5. *See McClure v. First National Bank of Lubbock, Texas,* 497 F.2d 490, 495 (5th Cir. 1974).

Although the *Reid* opinion did not develop the point, other Fifth Circuit decisions support the holding. *Herpich v. Wallace,* 430 F.2d 792 (5th Cir. 1970); *McClure v. First National Bank,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).

In count three of *Herpich,* this Court held that a corporate guarantor of a pledgor is not engaged in a "purchase" of stock. The decision was based upon the rationale that a transaction which is, in effect, an extension of credit on the pledgor's behalf "is not the type of fraudulent conduct which was meant to be forbidden . . . ." 430 F.2d at 812.

*McClure* involved a pledge of stock in consideration for the renewal of a loan to a third party. The complaint was brought by the *pledgor.* This Court held that the pledge of securities did not constitute a "purchase."

---

4. The Securities Act defines "sale" or "sell" to "include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C.A. § 77b(3). In the Exchange Act, these terms are defined to "include any contract to sell or otherwise dispose of." 15 U.S.C.A. § 78c(a)(14).

The terms "buy" or "purchase" are not defined in the Securities Act but they are defined in the Exchange Act to "include any contract to buy, purchase, or otherwise acquire." 15 U.S.C.A. § 78c(a)(13).

The term "security" is defined in the Exchange Act as "unless the context otherwise requires—[t]he term 'security' means any note . . . but shall not include currency or any note . . . which has a maturity at the time of issuance of not exceeding nine months . . . ." 15 U.S.C.A. § 78c(a)(10). Under the Securities Act, "unless the context otherwise requires—[t]he term 'security' means any note . . . ." 15 U.S.C.A. § 77b(1).

National Bank makes much of the Court's remark in *McClure* that "[w]e do not doubt that a pledge of securities can constitute a 'sale' in some cases . . .," 497 F.2d at 495, and seeks to limit the case to plaintiff's particular circumstances. The significant circumstances of *McClure,* the absence of foreclosure by the pledgee bank and the retention of title to the stock by the pledgor, are identical with those of the instant case.

Plaintiff would have us distinguish *McClure, Bellah,* and *Reid* on the ground that here the pledgee-promisee seeks protection of the act, while in those cases the pledgor-promissor brought suit. As Judge Friendly reflected in *Exchange National Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1137 (2d Cir. 1976), however, "we see nothing in the statutes that would justify holding that the same note was a security when a borrower from a bank invoked federal law and not a security when the bank asserted this." The converse is true. So it is with a purchase and a sale. Both parties must be protected by the act, or neither can be. We hold that the prior cases cannot be adequately distinguished on this ground.

There are contrary cases. National Bank refers to a line of cases decided under a different section of the securities act, § 5 of the Securities Act of 1933, 15 U.S.C.A. § 77e. *SEC v. Guild Films Co.,* 279 F.2d 485 (2d Cir.), *cert. denied,* 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960); *SEC v. Pig'n Whistle Corp.,* 359 F.Supp. 219 (N.D.Ill.1973); *SEC v. National Bankers Life Insurance Co.,* 334 F.Supp. 444 (N.D.Tex.1971), *aff'd,* 477 F.2d 920 (5th Cir. 1973). These cases hold that a bank becomes an "underwriter" when it forecloses and sells unregistered securities previously pledged to it as loan collateral. Foreclosure and sale in these situations, however, places the stock in the public arena protected by the securities acts. Absent such foreclosure, as in the instant case, these decisions offer little guidance.

Plaintiff also cites several cases which have held a pledge to be a sale. *Mallis v. FDIC,* 568 F.2d 824 (2d Cir. 1977), *cert.* *dismissed sub nom. Bankers Trust Co. v. Mallis,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978); *United States v. Gentile,* 530 F.2d 461 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *Kerbs v. Fall River Industries, Inc.,* 502 F.2d 731 (10th Cir. 1974); *Herpich v. Wallace,* 430 F.2d 792 (5th Cir. 1970); *American Bank & Trust Co. v. Joste,* 323 F.Supp. 843 (W.D.La.1970).

*Joste, Herpich,* and *Kerbs* can be distinguished factually from the situation here. In *Joste,* a suit under the antifraud provision of the 1933 Act, 15 U.S.C.A. § 77*l,* a sale had been attempted by the pledgee after default by the pledgor. Defendants did not assert the absence of a "sale" and the district court concluded that no serious issue existed. The issue of sale was not seriously raised and the court did not have the benefit of subsequent decisions of this Court.

In *Herpich,* the second count of the complaint alleged the papers were falsely drawn to denominate the transaction a pledge. This Court held the complaint adequately alleged a pretextual pledge agreement and that, if true, a sale and purchase within the statute had occurred.

*Kerbs* involved the retention of 2,000 shares of stock in consideration for a loan as well as the pledge of stock as collateral. As to the 2,000 shares, at least, ownership was transferred and a sale, for all practical purposes, did take place.

*Gentile* and *Mallis,* on the other hand, can hardly be distinguished from the facts in the instant case and are contrary to the decision reached here. In these cases, the Second Circuit held that a pledge constitutes a sale for the purpose of § 17(a) of the 1933 Act, 15 U.S.C.A. § 77q(a) and § 3(a)(14) of the 1934 Act, 15 U.S.C.A. § 78c(a)(14), respectively. The decisions were grounded upon the rationale that

the pledgee assumes a very real investment risk that the pledged securities will have continuing value, a risk that is identical in nature to the risk taken by investors which serves as the indisputable basis for statutory regulation of securities transactions.

*United States v. Gentile,* 530 F.2d 461, 467 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976).

This rationale might be a persuasive argument that the federal securities laws ought to encompass pledges, as well as purchases and sales. It does little to support a decision that they in fact do cover pledges. Congress can be presumed to know the difference between a collateral pledge transaction and a sale and purchase. If it had intended to cover both, it could have easily done so by words traditionally used to differentiate between the two.

The holding that the mere pledge of a security as collateral for a loan does not constitute a sale or purchase of a security within the meaning of the federal securities laws appears sound. The federal securities acts are designed to protect investors. This purpose is not affected by a pledge of stock.[5] As Professor Loss has stated, "federal legislation was hardly needed for privately negotiated pledge transactions between borrowers and lenders." L. Loss, Securities Regulation 649 (2d ed. 1961). The pledgee, unlike a securities purchaser, has a remedy on the note itself against makers and guarantors.

■ The rights and privileges of the parties are not affected by a pledge in the same manner as by a "sale" or "purchase." The pledgor generally (1) has the right to sell the stock subject to the security interest, (2) is entitled to vote the stock, (3) has the right to receive all dividends, and (4) continues to be liable for ad valorem taxes. *See generally,* L. Jones, Collateral Securities and Pledges §§ 1, 176a, 441, 602 (3d ed. 1912).

The pledgee, on the other hand, has "no general property right in the thing pledged, but only a right, upon default, to sell in satisfaction of the pledgor's obligation."

*Pauly v. State Loan & Trust Co.,* 165 U.S. 606, 622, 17 S.Ct. 465, 471, 41 L.Ed. 844 (1897). The pledgee does not participate in any appreciation of the stock, has none of the rights normally accorded shareholders, and has no right to sell the collateral for its own account. Indeed, its relationship is of a fiduciary character, *Easton v. German-American Bank,* 127 U.S. 532, 537, 8 S.Ct. 1297, 32 L.Ed. 210 (1888), and it must account for all proceeds in excess of the debt and profits accruing as a result of possession of the collateral. Restatement of Security § 27 (1941).

Pretextual collateral loans or instances where the ownership of the security is intended to pass to the nominal lender might not fall within the holding of this case, and will have to be dealt with as they arise. *Cf. Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) ("in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality."). In this case there is no suggestion that the form of the transaction, a collateral loan, did not represent the substance of the matter as well.

## II. *The Note as "Security"*

■ As an alternate basis of jurisdiction, National Bank urges that the $2,500,000 note issued to the bank by McIngvale be treated as a "security."

By their terms, the federal securities acts include notes, except short term notes, within the definition of a "security," "unless the context otherwise requires . . ." 15 U.S.C.A. § 77b(1); 15 U.S.C.A. § 78c(a)(10).

In two cases, this Court has held that notes issued to obtain bank loans were not securities within the federal securities laws. In *Bellah v. First National Bank,* 495 F.2d

---

**5.** This Court in *McClure v. First National Bank,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), concluded that:

[a] commercial bank in accepting a pledge of stock as additional consideration for the extension of an overdue commercial loan does

not necessarily affect the securities industry. . . . [M]ere acceptance of a stock pledge as collateral in a privately negotiated transaction between borrower and lender does not, of itself, bring within the scope of the federal securities acts a transaction otherwise outside their purview.

1109 (5th Cir. 1974), a borrower attempted to use § 10 of the 1934 Act and Rule 10b–5 in order to avoid a six-month note executed to renew indebtedness secured by a deed of trust on real estate. In rejecting the borrower's arguments, this Court chose not to rely on the short term of the note but based its decision on the ground that the note was issued in the context of a commercial loan transaction. In *McClure v. First National Bank,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), the Court decided that plaintiff, half-owner of a corporation, could not successfully invoke the federal securities laws to recover foreclosed corporate assets which had been pledged to secure a $200,000 one-year promissory note given for funds for the corporation. It was alleged that these funds had been fraudulently borrowed from the corporation to repay the personal debts of the other half-owner to the lending bank.

These decisions rest on a rationale sometimes described as a "commercial-investment dichotomy," which restricts the scope of "security" to those notes which have the character of an investment and excludes those of a commercial nature. *See SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974). *See also* Annot., 39 A.L.R.Fed. 357 (1978), for a detailed treatment of the cases applying this test.

There is no need to revisit the detailed analysis of these prior cases. We are bound by them. Nothing in this bank transaction indicates it to be anything other than a loan, evidenced by a promissory note, and secured by a pledge of securities. No special investment rights were given to the payee. The note was payable in fixed amounts at fixed times, repayment not being conditioned upon profit or productivity of the company. No class of investors was involved, only the lending bank. The bank anticipated no gain beyond repayment of the note with interest. The note was not a "security" within the meaning of the federal securities acts.

Plaintiff bank suggests rejection of the commercial-investment analysis, urging adoption of the so-called literal approach of the Second Circuit. *Exchange National Bank v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976). First, one panel of this Court cannot overrule the precedent of prior Fifth Circuit cases, *en banc* action being necessary for reversal of prior case law. Second, the Supreme Court has apparently discounted the so-called literal approach in an opinion rejecting the suggestion that the sale of shares called "stock" must be a security transaction simply because the statutory definition of a security includes the words "any . . . stock." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) ("[w]ith the exception of the Second Circuit, every Court of Appeals recently to consider the issue has rejected the literal approach urged by respondents." 421 U.S. at 849, n. 14, 95 S.Ct. at 2059, citing with approval *McClure,* among others).[6] Third, it is not at all certain that even under the Second Circuit approach the result here would be different. The court listed many cases where it would regard a note as not being within the antifraud provisions under the statutory admonition that a note is a security unless "the context otherwise requires." This transaction would seem to "bear a strong family resemblance," as

---

**6.** The context of the Court's remark is illuminating:

> The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors . . . . Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction:
> '[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975).

Judge Friendly phrased it, to those examples. 544 F.2d at 1138.

 Alternatively, National Bank insists that the only proper approach to the commercial-investment test is set forth in a SEC release detailing the position of the Commission on exemption from registration under the 1934 Act. Securities Act Rul.No. 4412, 26 Fed.Reg. 9158–9159 (Sept. 29, 1961).[7] In support of this proposition, it relies upon *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974), and *Bellah v. First National Bank*, 495 F.2d 1109 (5th Cir. 1974).

While *Continental Commodities* utilized the release criteria, the Court specifically stated that its conclusion "need not rest on an application of the factors contained in the SEC release alone. Rather, it is appropriate and preferable to consider and apply the judicially assessed characteristics ascribed to commercial and investment paper." 497 F.2d at 525.

In *Bellah*, the Court stated that the criteria were inapplicable because the maker, not the payee, sought to rely on them. It does not follow that they are exclusively applicable in the instant case where the payee invokes them.

Having carefully considered "the judicially assessed characteristics ascribed to commercial and investment paper," there is no need to consider the criteria in this situation. *See, e. g., McClure v. First National Bank*, 497 F.2d 490 (5th Cir. 1974) *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975) (holding note was not "security" without mention of the release criteria). They would appear to have little utility in reviewing a direct bank loan on pledged collateral evidenced by a single promissory note.

### Conclusion

Having failed to bring itself within the scope of the antifraud provisions of the

federal securities acts, National Bank did not establish federal jurisdiction. The district court therefore properly dismissed the complaint.

AFFIRMED.

---

7. The release states that:

The legislative history of the Act makes clear that section 3(a)(3) applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve Banks.