UNITED AMERICAN BANK OF NASHVILLE, Plaintiff-Appellant,

v.

William GUNTER et al., Defendants,

Federal Deposit Insurance Corp., Theodore M. Hutcheson and N. Roundtree Youmans, Defendants-Appellees.

No. 79–3345
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

July 9, 1980.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

Woods, Bryan & Thomas, Larry D. Woods, Nashville, Tenn., for plaintiff-appellant.

Huie, Sterne & Ide, Edgar H. Sims, Jr., Frank A. Lightmas, Jr., Atlanta, Ga., for Youmans.

Sutherland, Asbill & Brennan, John A. Chandler, J. D. Fleming, Jr., H. Wayne Phears, Atlanta, Ga., Myers N. Fisher, Legal Division, Federal Deposit Insurance Corp., Washington, D. C., Robert J. Green, Frank L. Skillern, Jr., Gen. Counsel, for Federal Deposit Ins. Corp.

Before BROWN, TJOFLAT and FRANK M. JOHNSON, Jr., Circuit Judges.

PER CURIAM:

This is an appeal from the entry of final judgment in favor of the Federal Deposit Insurance Corporation, Theodore M. Hutcheson, and N. Roundtree Youmans.[1] For the reasons set out in greater detail in the opinion of the District Judge, *United American Bank of Nashville v. Gunter*, No. C77–1682A (N.D.Ga., June 9, 1979), the decision was correct.[2] See *id.* reproduced in Appendix A.

AFFIRMED.

*Appendix A*

ORDER

This is an action for damages arising out of the purchase by plaintiff United American Bank of Nashville ("United American") of a participation interest in a loan extended by the Hamilton National Bank of Chattanooga ("Chattanooga Bank") to defendants William L. and Camille S. Gunter. Plaintiff United American alleges that in connection with its purchase of the loan participation, defendants William L. Gun-

---

1. Final judgment was entered pursuant to F.R. Civ.P. 54(b), leaving pending the cross-claims and counterclaims of William L. Gunter and Camille S. Gunter.

2. In affirming the District Court, this Court simply uses the trial judge's discussion of *FBS Financial, Inc. v. CleveTrust Realty Investors*,

[1978] Fed.Sec.L.Rep. (CCH) ' 96,341 (N.D. Ohio 1977) and *Provident National Bank v. Frankford Trust Co.*, 468 F.Supp. 448 (E.D.Pa. 1979) as illustrations of the factors involved. We express no opinion as to the correctness of either or both of these decisions.

ter, Camille S. Gunter, Theodore M. Hutcheson, N. Roundtree Youmans, and the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver of the Chattanooga Bank, violated section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated pursuant to section 10(b) of the Exchange Act; section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); section 29 of the Exchange Act, 15 U.S.C. § 78cc; and "applicable state securities laws and regulations." Presently pending before the Court are defendant FDIC's motions for leave to amend its answer and for summary judgment.

The pertinent facts in this case are as follows. On December 31, 1974, defendants William L. Gunter and his wife, Camille S. Gunter, purchased approximately 61 percent of the outstanding common stock of the Hamilton Bank and Trust Company of Atlanta ("Atlanta Bank") from defendant Theodore M. Hutcheson. In order to buy the stock, the Gunters borrowed $5.5 million from the Chattanooga Bank. The loan from the bank was secured by the stock purchased by the Gunters and was evidenced by two promissory notes, one in the amount of $3.0 million and the other in the amount of $2.5 million. Only the $2.5 million note is at issue in the case *sub judice*. The note bore interest at the lesser of the Chattanooga Bank's "prime rate" or nine percent per annum. The note was payable in full on January 3, 1977.

Also on December 31, 1974, the Chattanooga Bank sold a $1.5 million participation interest (60% interest) in the $2.5 million note to plaintiff United American, a commercial bank chartered under the laws of the state of Tennessee.[1] At the time of this transaction, the plaintiff was known as the Hamilton Bank of Nashville and was a wholly owned subsidiary of Hamilton Bancshares, Inc. ("HBI"), a Tennessee bank holding company which also owned the Chattanooga Bank. It is undisputed that the decision by the plaintiff to participate in the Gunter loan was made during a telephone conversation on or about December 31, 1974, between an officer of the Chattanooga Bank and either Finis L. Nelson, then chairman of the board of directors of the plaintiff bank, or James M. Denton, then president of the plaintiff bank. Nelson Deposition at 29–35; Denton Deposition at 4.

Nelson was certain that either he or Denton authorized the purchase of the participation, but he has no present recollection of the particular telephone conversation during which the purchase was authorized. Nelson Deposition at 31–35. Nelson testified that if he was the person who made the decision, he does not remember the conversation because it was a routine transaction. Nelson Deposition at 32, 34. According to Nelson, it was "fairly routine" for an officer of the Chattanooga Bank to call Nelson or Denton and say "[w]e have a loan to Mr. So and So or to such and such a company there, and we want to—we want you to take participation of so much in it." Nelson Deposition at 42. Nelson further testified that he has no present recollection of any false information given to the plaintiff in connection with the participation in the Gunter loan, nor of any information that the Chattanooga Bank failed to give the plaintiff in connection with the participation. Nelson Deposition at 51, 131.

Denton, the only other bank employee who might have authorized the purchase of the loan participation, testified that he could not recall whether or not he spoke to anyone with respect to the Gunter note and participation and could not recall any specific representations made in connection with the note and participation. Denton Deposition at 4. Denton's description of the manner in which the plaintiff bank

---

1. The Chattanooga Bank also sold a 40% participation interest in the $2.5 million Gunter note to the Hamilton Bank of Johnson City on December 31, 1974. This participation interest was the subject of an order of this Court in *Hamilton Bank of Johnson City v. FDIC*, No. 77–2054 (N.D.Ga. Dec. 1, 1978).

purchased loan participations from the Chattanooga Bank was similar to the "routine" described by Nelson. In his deposition testimony, Denton stated:

A: Generally, we would get a call . . saying that we were being sent a participation in X loan.

Q: And what would you say, at that point?

A: Send it on. It was generally on the way.

Q: Was that not common that they would notify you of [it] being sent, after they had already made the decision to send it to the Nashville bank?

A: On occasions, that was very true. Very seldom did we make any credit judgments on the front end of anything of that nature.

Q: As a practical matter, did you—did the Nashville bank, now known as United American Bank of Nashville, have any choice, when the Chattanooga bank called about these participations?

A: No.

Denton Deposition at 25.

As of December 31, 1974, the date on or about which the plaintiff bank's participation in the Gunter note was approved, the plaintiff did not have a copy of the Gunter note, Gunter's financial statements, or any other documents relating to the participation in the note. Denton Deposition at 8. The plaintiff bank's loan participation was approved on a *pro forma* basis at an executive committee meeting on January 7, 1975, but the note and participation certificate were not forwarded to the plaintiff until January 21, 1975. Nelson Deposition at 96; Denton Deposition at 8. In addition, Gunter's financial statements were not forwarded to the plaintiff until March 11, 1975, more than two months after the plaintiff's executive committee had approved the plaintiff's participation in the Gunter note. Denton Deposition at 8, 9.

The loan participation certificate mailed to the plaintiff embodied the entire agreement between the plaintiff and the Chattanooga Bank. Nelson Deposition at 40, 41. It specifically provided that the "only obligation of [the Chattanooga Bank] shall be to distribute to Participant its proportionate share of payment of the principal and interest which Bank receives on account of the said note." The participation certificate further provided that the 60% interest in the Gunter note was "transferred and assigned by [the Chattanooga Bank] without recourse or liability on its part." Nelson confirmed in his testimony that the Chattanooga Bank had no duty under the participation certificate other than crediting the plaintiff's account with its proportionate share of any payment received on the Gunter note. Nelson Deposition at 37.

Repayment of the Gunter note was not dependent on the success or failure of the Atlanta Bank, but was a function of the ability of the Gunters to repay the loan and of the collateral available to the Chattanooga Bank. Nelson Deposition at 114–15. The only money the plaintiff expected to receive as a result of its participation in the Gunter note was the principal of $1.5 million that it had advanced plus interest as stated in the Gunter note. Nelson Deposition at 41. The participation did not give the plaintiff the right to share in any profit generated by the Atlanta Bank.

In his testimony, Nelson stated that commercial banks sometimes sell participation interests in loans to correspondent banks in order to avoid exceeding the legal lending limit governing the percentage of loanable funds that can be committed to a single borrower. Nelson Deposition at 19. Nelson also stated that in order for a commercial bank to purchase a participation interest in a loan extended by another bank, the bank must have funds available for lending purposes. Nelson Deposition at 22. Nelson further testified that the plaintiff bank evaluated loan participations in the same manner as it evaluated direct loan applications and that loan participations were treated as direct loans on the bank's books and on the "call statements" filed with regulatory agencies. Nelson Deposition at 24–25, 101. Finally, Nelson distinguished the plaintiff bank's commercial lending activi-

ties from its investment activities and placed bank participations in the commercial loan category. Nelson Deposition at 100–02.

The plaintiff bank was paid a total of $12,000 in interest on its loan participation in the Gunter note before the Gunters defaulted in the repayment of the note in January, 1976. Nelson Deposition at 43. After becoming aware of the default in payment of the note, the plaintiff's executive committee recommended in February, 1976, that "immediate action should be taken to secure payment" of the Gunter note. Nelson Deposition, Exhibit 20. Also during the month of February, 1976, the Chattanooga Bank failed and the FDIC assumed control of the bank as Receiver and for liquidation. As early as July, 1976, Nelson became aware of certain alleged side agreements between defendant N. Roundtree Youmans, an officer and director of HBI and the Chattanooga Bank, and defendant William L. Gunter regarding repayment of the $2.5 million Gunter note. Nelson Deposition at 47, 155.

The Gunter note and the plaintiff's participation in the note became due and payable on January 3, 1977. The Gunter defendants have refused to repay the principal and interest due under the note and participation notwithstanding the demand for repayment of the amounts due. Plaintiff United American brought this action on October 17, 1977, in order to recover from the defendants the principal of $1.5 million plus accrued interest through the date of judgment. United American alleges in its complaint that defendant FDIC, as successor to the Chattanooga Bank, either coerced or induced the plaintiff to participate in the Gunter loan through the defendant's alleged misrepresentations and failure to disclose material facts. The plaintiff further alleges that defendants William L. and Camille S. Gunter, Theodore M. Hutcheson and N. Roundtree Youmans aided and assisted defendant FDIC in its alleged misrepresentations and omissions. Plaintiff United American contends that the actions of the defendants operated as a fraud and a deceit upon the plaintiff and caused the

plaintiff to suffer damages in the amount of $1.5 million plus interest.

Defendant FDIC has moved for summary judgment pursuant to Fed.R.Civ.P. 56 and contends in support thereof that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law for the following reasons: (1) the federal securities laws are inapplicable because the sale by the Chattanooga Bank of a participation in the Gunter note was not the sale of a "security"; (2) the plaintiff's state and federal securities law claims are barred by the applicable statutes of limitations; (3) the plaintiff has failed to show that the alleged fraud in fact caused loss or damage and thus has failed to state a claim for securities fraud; and (4) the transaction in question violated neither the Tennessee Securities Act nor the common law of fraud.

In opposition to defendant FDIC's motion for summary judgment plaintiff United American contends that its participation interest in the Gunter loan is a security because (1) the participation agreement is by definition a security; (2) the Gunter note constitutes a security and therefore the plaintiff's participation in that underlying security is itself a security; and (3) regardless of the status of the underlying note, the participation agreement constitutes an investment contract and is therefore a security. Plaintiff United American further contends that none of its claims are barred by applicable statutes of limitations, that defendant FDIC's conduct with regard to the sale of the participation agreement did in fact cause the plaintiff's loss and damage, and that the transaction in question violated the Tennessee Securities Act and the common law of fraud.

After careful review of the pleadings, depositions, exhibits, and briefs filed in this action, the Court concludes that defendant FDIC's motion for summary judgment must be granted because there is no genuine issue as to any material fact and the defendant is entitled to judgment as a matter of law. Defendant FDIC is entitled to

judgment in its favor with respect to the plaintiff's federal claims for two reasons. First, the Court lacks subject matter jurisdiction over the plaintiff's federal claims because this suit does not involve the purchase or sale of a "security" within the meaning of the applicable federal securities statutes. Secondly, even if the Court did have jurisdiction over the plaintiff's federal claims, the plaintiff's loss, if any, was not caused by any act of omission of defendant FDIC. Defendant FDIC is also entitled to summary judgment with respect to the plaintiff's state law claims because the plaintiff did not rely on any alleged misrepresentation or omission by defendant FDIC in connection with the plaintiff's purchase of the loan participation in the Gunter note.

In regard to the jurisdictional issue present in this case, section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), defines the term "security" as:

> . . . *any note*, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; *or any certificate of interest or participation in . . . any of the foregoing . . .* [2] (Emphasis added.)

Although the definitional sections of the Exchange Act and the Securities Act literally apply to "any note," a literal application of these statutes was rejected by the Supreme Court in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), and by the Fifth Circuit in *Bellah v. First National Bank*, 495 F.2d 1109 (5th Cir. 1974), and

*National Bank of Commerce v. All American Assurance Co.*, 583 F.2d 1295 (5th Cir. 1978). In *Forman*, the Second Circuit had held that because shares of stock in a cooperative housing project were called "stock," the shares were securities within the meaning of the Securities Act and the Exchange Act. The Supreme Court reversed the appellate court's decision, stating:

> We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock," must be considered a security transaction simply because the statutory definition of a security includes the words "any . . stock." Rather we adhere to the basic principle that has guided all of the Court's decisions in this area:
>
> > "[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 [88 S.Ct. 548, 553, 19 L.Ed.2d 564] (1967).
>
> 421 U.S. at 848, 95 S.Ct. at 2058. (Footnote omitted.) [3]

The Court further stated that the test for distinguishing a securities transaction from commercial dealings is:

> "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). (Footnote omitted.)

This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is [1] the presence of an investment [2] in a common venture [3] premised on a reasonable expectation of profits [4] to be derived from the entrepreneurial or managerial efforts of others. 421 U.S. at 852, 95 S.Ct. at 2060.

---

2. Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), defines the term "security" similarly, and these two definitions have been held to be virtually identical. *Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967).

3. The Court also stated that "[w]ith the exception of the Second Circuit, every Court of Appeals recently to consider the issue has rejected the literal approach urged by respondents." 421 U.S. at 849, n.14, 95 S.Ct. at 2059 n.14.

The Fifth Circuit has similarly rejected a literal application of the definitional sections of the Securities Act and the Exchange Act to notes alleged to be securities. In *Bellah v. First National Bank*, 495 F.2d 1109 (5th Cir. 1974), the Fifth Circuit stated that a note's status as a security depends on whether it can be characterized as commercial or investment in nature. 495 F.2d at 1112–13. The court held in *Bellah* that a six-month promissory note secured by a deed of trust on real property was not a security within the meaning of the Exchange Act because the note was issued in the context of a commercial loan transaction. *Id.* at 1113–14. The "commercial-investment dichotomy" adopted in *Bellah* was reaffirmed in *McClure v. First National Bank*, 497 F.2d 490, 495 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Woodward v. Metro Bank*, 522 F.2d 84, 92 (5th Cir. 1975); and *National Bank of Commerce v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir. 1978). Essentially, these cases hold that ordinary commercial notes secured by a pledge of collateral are not securities within the meaning of the Securities Act and the Exchange Act.

The Fifth Circuit's discussion of the commercial-investment dichotomy with respect to the promissory note at issue in *National Bank of Commerce* is particularly appropriate to the case *sub judice*. After discussing several prior commercial-investment cases, the Fifth Circuit stated:

> There is no need to revisit the detailed analysis of these prior cases. We are bound by them. Nothing in this bank transaction indicates it to be anything other than a loan, evidenced by a promissory note, and secured by a pledge of securities. No special investment rights were given to the payee. The note was payable in fixed amounts at fixed times, repayment not being conditioned upon profit or productivity of the company. No class of investors was involved, only the lending bank. The bank anticipated

no gain beyond repayment of the note with interest. The note was not a "security" within the meaning of the federal securities acts. 583 F.2d at 1301.

In the case *sub judice*, the loan from the Chattanooga Bank to the Gunters was similarly evidenced by promissory notes and secured by a pledge of securities. The $2.5 million Gunter note was payable in fixed amounts at fixed times, and repayment was not conditioned on the success or failure of the Atlanta Bank. Plaintiff United American anticipated no gain beyond repayment of the principal it advanced plus interest at a fixed rate. These facts establish that the Gunter note was not a security within the meaning of the federal securities acts, but rather was a promissory note issued in the context of a commercial loan transaction.

As to the issue of whether the plaintiff's participation in the Gunter note is a security under the Securities Act and the Exchange Act, the Court rejects the plaintiff's contention that the participation interest is by definition a security because of the Fifth Circuit's holding in *Lehigh Valley Trust Co. v. Central National Bank*, 409 F.2d 989, 992 (5th Cir. 1969). The Supreme Court has rejected the literal approach employed by the court in the *Lehigh Valley Trust Co.* case and has consistently counseled that the application of the federal securities statutes turns on the economic realities underlying a transaction. *Forman*, 421 U.S. at 849, 95 S.Ct. at 2059; *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Howey*, 328 U.S. at 298, 66 S.Ct. at 1102 (1946). The Fifth Circuit has also rejected the ritualistic application of the federal securities laws and has focused, in recent cases, on whether the transaction at issue is commercial or investment in nature. See, e. g., *National Bank of Commerce*, 583 F.2d at 1301; *McClure*, 497 F.2d at 495; *Bellah*, 495 F.2d at 1113. It is therefore appropriate for this Court to employ the "economic realities" approach embodied in the *Howey-Forman* test in determining whether the plaintiff's loan participation is a security.[4]

---

4. The court's analysis below is also dispositive of the issue of whether the loan participation in question is an "investment contract," as

defined in *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–03, and hence a security under the federal securities laws.

Two recent district court decisions involving loan participations which are instructive in their application of the four-pronged *Howey-Forman* test are *FBS Financial, Inc. v. CleveTrust Realty Investors*, [1978] Fed. Sec.L.Rep. (CCH) ¶ 96,341 (N.D.Ohio, Dec. 23, 1977), and *Provident National Bank v. Frankford Trust Co.*, 468 F.Supp. 448 (E.D. Pa.1979). At issue in the *FBS Financial* case was the security status of a subparticipation in a construction loan. Plaintiff FBS Financial ("FBS") purchased a $2 million "subparticipation" in defendant Cleve-Trust Realty Investors' ("CleveTrust") $4.5 million participation in a $49 million construction loan extended by the Advance Mortgage Company ("AMC") to 30 North LaSalle Street Corporation. [1978] Fed.Sec. L.Rep. (CCH) ¶ 96,341 at 93,146. As lead construction lender, AMC sold loan participations to four other lenders, including defendant CleveTrust. *Id.* CleveTrust subsequently sold a subparticipation interest in its loan participation to FBS. Under the terms of the subparticipation agreement, AMC retained sole responsibility for servicing and administering the construction loan. *Id.* at 93,147. FBS's consent, however, was required for the amendment, termination, or release of loan documents, or for compromising claims, waiving rights, releasing security, or settling litigation. *Id.* at 93,151. As to incurred defaults, CleveTrust was obligated to consult FBS, and FBS could require CleveTrust to take remedial action with respect to any default. *Id.*

Several months after construction work began, the project experienced difficulties, and the closing date for the permanent financing necessary to repay the participants and subparticipants was postponed on several occasions. *Id.* FBS consequently became concerned about its position and demanded that CleveTrust repay its subparticipation. *Id.* at 93,152–53. When Cleve-Trust failed to make full repayment, FBS brought suit for the balance. *Id.* In its complaint, FBS alleged that a number of misrepresentations had been made to it, including the extent to which the building had been leased, the annual rental income from the building, and whether there were any defaults under the original loan documents at the time the subparticipation was sold. *Id.* FBS asserted that the subparticipation was a security within the meaning of the Exchange Act as a "certificate of interest or participation in . . . any note . . . ," but CleveTrust contended that the subparticipation was simply an ordinary commercial lending transaction beyond the scope of the Act. *Id.* at 153–55.

The court in *FBS Financial* analyzed the transaction in terms of the *Howey-Forman* test stated above. The four elements of a security under this test are: (1) the presence of an investment; (2) a common venture; (3) a reasonable expectation of profits; and (4) such profits to be derived from the entrepreneurial or managerial efforts of others. *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060; *FBS Financial*, [1978] Fed. Sec.L.Rep. (CCH) ¶ 96,341 at 93,155. With respect to the first element, the court noted that the parties had characterized the transaction as a "loan" in all of the documents and correspondence, and that the purchase of the participation by FBS had been put before its "Loan Approval Committee." Although not "dispositive," the Court concluded that the "pervasive use by FBS and CleveTrust of the term 'loan' to describe the subject transaction, coincident with the basic premise that Advance was the 'lead lender'" provided proof that the parties viewed the transaction as a commercial loan. [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,341 at 93,156.

The court also examined the extent of collateral and the degree of risk associated with the loan. The court recognized that "'[i]n one sense, every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest,'" quoting *C. N. S. Enterprises, Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). *Id.* The court noted, however, that there was substantial collateral and a firm commitment from a take-out lender, and that the money paid by FBS for the subparticipation had

not been employed to obtain capital assets. *Id.* at 93,156–57. The court concluded that these factors established that FBS had not made an investment. *Id.*

With respect to the requirement of a reasonable expectation of profits, the court stated that "[t]he expectation of appreciation in the value of an investment, or a variable rate of return are indicative of security status." *Id.* The court also stated that "[t]he impossibility of appreciation in the value of an investment is properly considered in determining a reasonable expectation of profit." *Id.* at 93,158. After noting that interest paid to participants was at a fixed rate and that there was no anticipated appreciation in the value of FBS's subparticipation, the court concluded that "there was no 'reasonable expectation of profit' either over and above or of a different nature than that found in a commercial lending transaction." *Id.*

As for the requirement that profits be derived from the entrepreneurial or managerial efforts of others, the court rejected plaintiff FBS's contention that this element was satisfied because of the dependency of the loan participants on the efforts of AMC, the lead lender. *Id.* at 159. The court reasoned that although the lead lender was responsible for performing administrative and management services for the participants in the loan, these services were not entrepreneurial in the *Howey-Forman* sense. *Id.* The court noted that the interest income to the participants was not to be derived from any "managerial efforts" of AMC, but rather "was to be derived from the completion of the construction of the . . . office building according to schedule, the good faith compliance of the borrowers and guarantors, and the willingness of the permanent lenders to keep their take-out commitments." *Id.* The court concluded that because the subparticipation transaction failed to satisfy the elements of the *Howey-Forman* test discussed above, the plaintiff's loan subparticipation did not constitute a security. *Id.*

*Provident National Bank, supra,* concerned the security status of Provident National Bank's ("Provident") participation in a loan extended by the Frankford Trust Company ("Frankford") to a redevelopment corporation for the purpose of constructing twenty-five single family townhouses. Under the terms of the participation agreement, plaintiff Provident and defendant Frankford each acquired a 50% share in the interest accruing on the loan, in the mortgage and bond securing the loan, and in the repayment of the principal. 468 F.Supp. at 450. The loan ceiling was set at $345,400 and the interest was to float at 1% above the Philadelphia prime rate with a floor of 10%. *Id.* The agreement contemplated that the loan would be made in periodic advances, with each party assuming its proportionate share of the loan commitment. *Id.* In its status as lead bank, Frankford was designated the mortgagee and was responsible for monitoring the status of the loan. *Id.*

Pursuant to the participation agreement, plaintiff Provident paid $41,850 to Frankford during a four month period as its proportionate share of loan advances to the redevelopment corporation. *Id.* at 450. After attempting unsuccessfully to ascertain from defendant Frankford the status of the loan, plaintiff Provident visited the construction site and learned that work on the project had ceased. *Id.* The plaintiff discovered that the defendant had failed to perform the duties it had represented it would assume in its role as lead lender and that the defendant had misrepresented certain other facts. *Id.* at 450–451. The plaintiff subsequently brought suit under the federal and state securities laws to recover the sum that it had advanced to the defendant as its proportionate share of the loan.

The court in *Provident National Bank* followed the reasoning of the *FBS Financial* court in holding that plaintiff Provident's loan participation was not a security under the federal securities laws. The court noted that collateral was present to secure the loan, that the return expected by Provident was simply the repayment of the

amounts advanced plus a fixed rate of interest, that any profits realized were not the result of the entrepreneurial or managerial efforts of others, that there was no public offering, that there was no indication that the participation was purchased for speculation or investment, and that the plaintiff was not a "passive investor" in need of the protection of the federal securities acts. *Id.* at 454–455. The court accordingly concluded that "Nothing about this transaction earmarks it as anything other than a routine commercial financing agreement between two banks, and the economic realities simply will not support the conclusion that this participation is a 'security.'" *Id.* at 455.

There are significant similarities between the loan participations in the *FBS Financial* and *Provident National Bank* cases and the loan participation at issue in the case *sub judice.* As in *FBS Financial,* the parties to the instant transaction have always characterized it as a loan. In his deposition, Mr. Nelson repeatedly referred to United American's participation in the Gunter note as a loan and also testified that approval for participating in a loan was given by the same people and in the same manner as the approval for making a direct loan. Nelson Deposition at 6, 7, 42, 51, 56, 69, and 81. Nelson further testified that the participation purchased by plaintiff United American was shown on its records, including records which it submitted to regulatory agencies, as a loan. Nelson Deposition at 28, 101, and 109.

The Gunter loan, as in *FBS Financial* and *Provident National Bank,* was fully collateralized and, in addition, was made to a wealthy individual and his wife.[5] Nelson admitted that the plaintiff did not intend for repayment to be conditioned on the success of the Atlanta Bank and also admitted that the plaintiff did not expect to share in any profit of the Atlanta Bank. Nelson Deposition at 41, 114. Rather, repayment of the Gunter note was a function

of the ability of the Gunters to repay the loan and of the collateral available to the Chattanooga Bank. Nelson Deposition at 114–15. These factors negate the validity of the plaintiff's assertion that the plaintiff was, in effect, making an investment in the Atlanta Bank.

With respect to the *Howey-Forman* requirement of a reasonable expectation of profits, it is important to note that as in *FBS Financial* and *Provident National Bank,* the only money United American expected to receive as a result of its participation was repayment of the principal it loaned plus interest at a fixed rate. Nelson Deposition at 41. In view of the facts that there was no anticipated appreciation in the value of the plaintiff's loan participation and that the rate of return was fixed, that Court concludes that the plaintiff's expected return was no different than that expected in an ordinary commercial transaction.

As for the requirement that profits be derived from the entrepreneurial or managerial efforts of others, it is apparent that plaintiff United American was not relying on any entrepreneurial efforts of the Chattanooga Bank. Under the terms of the loan participation certificate, the Chattanooga Bank was not required to police the collateral, review financial statements, realize on the collateral, or institute suit in the event of default on the Gunter note. The Chattanooga Bank's only responsibility was to collect principal and interest and forward proportionate shares to the participants. Nelson Deposition at 37. This single administrative duty is considerably less significant than the administrative services found insufficient to constitute "entrepreneurial or managerial efforts" in *FBS Financial* and in *Provident National Bank.*

As counsel for defendant FDIC contends, the undisputed facts in the case *sub judice* show that the plaintiff's loan participation is not a security under the *Howey-Forman* test. The participation was not an investment premised on a reasonable expectation

---

**5.** It is undisputed that at the time the loan in question was made, Mr. Gunter's financial statement showed a net worth of approximately $17,000,000.

of profits to be derived from the entrepreneurial or managerial efforts of others. Rather, the participation was part of a routine commercial loan transaction beyond the purview of the federal securities laws. For this reason, the Court lacks subject matter jurisdiction over the plaintiff's claims brought under the Securities Act and the Exchange Act, and defendant FDIC is accordingly entitled to summary judgment with respect to these claims.

█ It is important to note that even if the Court did have jurisdiction over the plaintiff's claims brought under the federal securities laws, defendant FDIC would still be entitled to judgment in its favor because the plaintiff's loss, if any, was not caused by any act of the defendant. Plaintiff United American alleges in its complaint that the Chattanooga Bank "induced" it to participate in the Gunter note, but failed to disclose certain facts regarding the note and alleged agreements with Gunter. The plaintiff contends that these alleged failures to disclose caused it "damages" of $1,500,000, the amount of its participation.

In their deposition testimony, however, Nelson and Denton stated that they could not recall any false information given to them in connection with the plaintiff's purchase of the loan participation. Nelson Deposition at 131; Denton Deposition at 4. They were also unable to recall any information that was withheld from them. *Id.* Furthermore, it is apparent from the depositions of Nelson and Denton that the information disclosed or not disclosed to them had nothing to do with the plaintiff's purchase of an interest in the Gunter note. The testimony set forth above on pages 2 and 3 of this Order shows that, as a practical matter, the plaintiff had no choice concerning whether it would purchase a participation in a loan extended by the Chattanooga Bank. Because the plaintiff had no decision to make regarding its loan participation, it cannot establish a causal connection between the alleged nondisclosures and its purchase of an interest in the Gunter note.

█ As this Court has held recently in *Hamilton Bank of Johnson City v. FDIC*, Civ.A.No. C77–2054A at 8 (Dec. 1, 1978), a case involving virtually identical facts, the lack of causation between alleged nondisclosures and the plaintiff's alleged loss necessarily defeats the plaintiff's claims. In order for a plaintiff to recover in securities cases involving allegations of nondisclosure, the plaintiff must establish that it would have acted differently had the required disclosure been made to it. *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1315 (5th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100, 103 (5th Cir. 1970), *cert. denied*, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971). Since plaintiff United American cannot establish that it would have acted differently if certain disclosures had been made to it, it is not entitled to recover damages from defendant FDIC under the federal securities laws.

█ In addition to its federal claims, plaintiff United American had brought this action under "applicable state securities laws and regulations" and under the common law of fraud and deceit. Although this action is pending in a United States District Court in Georgia, the "grouping of contacts" required under Georgia conflict of law principles establishes that Tennessee is the "center of gravity" of this action and that the plaintiff's state law remedy is therefore governed by Tennessee law. *See Alberts v. Davis*, Civ.A.No. C75–2483A at 9–12 (N.D.Ga. Sept. 29, 1978); *Allen v. Smith & Medford, Inc.*, 129 Ga.App. 538, 542, 199 S.E.2d 876 (1973). The plaintiff has not articulated any specific theory which would give rise to a cause of action under Tennessee law, but does claim that the transaction at issue violates the common law of fraud and deceit.

█ Plaintiff United American's common law claim must fail for the same reason that its federal claims fail. As discussed above, the plaintiff cannot show any causal connection between its alleged loss

and the Chattanooga Bank's alleged nondisclosures. Under Tennessee law, causation and reliance are essential elements of a claim for fraud and deceit. *Merritt-Chapman & Scott Corp. v. Elgin Coal, Inc.,* 358 F.Supp. 17, 21 (E.D.Tenn.1972), *aff'd* 477 F.2d 598 (6th Cir. 1973); *Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228, 232 (Tenn.App.1976); *Dozier v. Hawthorne Development Co.,* 37 Tenn.App. 279, 262 S.W.2d 705, 709 (1953). Since the plaintiff can establish neither causation nor reliance in connection with its purchase of a participation interest in the Gunter note, it is not entitled to damages under its common law claim.

Accordingly, for all of the foregoing reasons, defendant FDIC's motion for summary judgment must be, and it is, hereby GRANTED pursuant to Fed.R.Civ.P. 56. Defendant FDIC's motion for leave to amend its answer is moot and is hereby DENIED.

IT IS SO ORDERED, this 7 day of June, 1979.

(s) CHARLES A. MOYE, JR.
United States District Judge.