**Mark C. BYRON, Plaintiff,**

v.

**Charles T. MELOON, Defendant.**

**Civ. A. No. 2589.**

United States District Court
D. New Hampshire.

Aug. 12, 1968.

Charles F. Leahy and Ronald L. Snow, Orr & Reno, Concord, N. H., for plaintiff.

John R. Goodnow, Goodnow, Arwe & Ayer, Keene, N. H., for defendant.

## OPINION

CAFFREY, District Judge.*

This is a civil action in which the plaintiff Mrs. Mark C. Byron, a citizen of the State of New York, seeks to recover money damages from Charles T. Meloon, a citizen of the State of New Hampshire. The complaint as amended is in the nature of a bill in equity. In it plaintiff alternatively seeks an accounting from defendant concerning real estate allegedly conveyed by her to defendant pursuant to an agreement between them for a joint venture, a finding that defendant is a constructive trustee for her benefit, re-conveyance of the real estate to her, money damages, or an order that defendant convey the real estate to a court-appointed Commissioner who will sell the property and pay the proceeds into court for distribution to plaintiff in accordance with the findings made by the Court in this matter, and other relief. In a post-trial brief plaintiff specifically states that she seeks to recover her "actual losses, that is, the value of the equity of redemption in the real estate prior to the transaction by which the property was transferred to the defendant, plus her actual out-of-pocket expenditures."

Defendant's answer consists of a denial of the principal allegations of the complaint and an affirmative defense consisting of a claim that he has expended cash, time and effort, the total value of which is in excess of the present fair market value of the property involved herein.

Diversity jurisdiction of this court is properly invoked, since it has been alleged and proved that the matter in controversy, exclusive of interest and costs, exceeds the amount of $10,000. The case was tried to the Court and the parties have filed post-trial requests for findings and rulings, and memoranda in support of their respective positions. I find and rule as follows:

In July of 1955, and prior thereto, plaintiff was the record owner in fee of a tract of land with the buildings thereon in Dublin, New Hampshire, subject to a first mortgage in the amount of $19,235 held by the Union Trust Company, of Concord, New Hampshire. This realty consists of approximately 57 acres of land located at the foot of Mt. Monadnock on its northerly side. It has 27 feet of frontage on the edge of a lake and contains three buildings: an 18-room main house which has six master bedrooms, four maids' bedrooms, livingroom, diningroom, study, reception hall, children's playroom, maids' diningroom, and laundry; a converted carriage house; and a converted ice house. The property was appraised at $55,000 for mortgage purposes by the Manchester Savings Bank in 1956. Plaintiff had originally acquired it from her husband in 1938. Subsequently, the then mortgagee, one Robert L. Johnson, had taken control of the property, presumably, but not clearly shown on this record, by way of a mortgage foreclosure. In 1952 Johnson re-conveyed it to plaintiff for $12,000. Plaintiff took title in fee, giving Johnson a $12,000 chattel mortgage on the furniture and other personal property located on the estate, and also on the furniture located in her apartment in New York.

The property was unoccupied throughout World War II and was used by plaintiff's family only intermittently and for short periods thereafter. Plaintiff undertook to renovate and modernize the

* Sitting by designation.

property so that it could be rented during the summer vacation season to tenants who did not employ a staff of servants. She sought to obtain a mortgage at various New Hampshire banks and on August 1, 1952 obtained a real estate mortgage from the Union Trust Company, of Concord, to finance these improvements. Thereafter, the mortgage was increased on two occasions by the Union Trust Company and the proceeds were used for repairs and modernization of the main house and for restoration of the grounds.

Plaintiff was unable to rent the house between 1952 and 1954. Her first rental was made for July and August of 1955, for $1,200, to a family from Cleveland, Ohio. She then undertook to obtain additional funds in order to renovate the carriage house so that it could be rented to friends of the tenant of the main house. The Union Trust Company declined to further increase the mortgage and her attempts to obtain elsewhere $2,000 in additional mortgage funds were unsuccessful. A Peterborough bank appraised the property as sufficiently valuable to support a $33,000 mortgage, but rejected her application because, in its judgment, her income was insufficient to carry that size mortgage.

While seeking the additional mortgage funds plaintiff was referred to Meloon, Assistant Treasurer and person in charge of the Mortgage Department, of the National Grange Mutual Insurance Company, of Keene. He unsuccessfully assisted her in seeking to place a mortgage at this time and, eventually, he personally made an unsecured loan of several thousand dollars to her.

An attempt by plaintiff to obtain more mortgage funds on condition that her interest payments be guaranteed both by a lawyer friend from New York and by the defendant Meloon was likewise unsuccessful.

Thereafter, plaintiff and defendant had a meeting in New York at which they discussed what course of action might be taken with reference to this property. Plaintiff had earlier discussed incorporating the property and defendant told her that if she would do that he would be willing to form a corporation with her and by so doing put his credit and her credit behind the new corporation. He further told her that if this were done they could undoubtedly secure a $33,000 mortgage because their combined income would then justify it. Plaintiff at this time had almost no income and was "in a very serious financial position." Meloon said he would take care of the Union Trust payments and certain outstanding bills. Plaintiff at this time was working in New York City. Her occupation was, as described by her, "I retail women's ready-to-wear to a private clientele; small, without stocking anything. I do not have a shop. I take them to wholesale houses." The defendant was at his place of employment in New Hampshire.

During the winter of 1955–1956, plaintiff and defendant had various telephone conversations in which defendant reported his activities to plaintiff in connection with this matter. In the spring of 1956, defendant told Mrs. Byron that the Manchester Savings Bank had approved a $33,000 mortgage on this property. Plaintiff testified, and I find, that she was then under the impression that the Manchester Savings Bank had approved a mortgage to the corporation which was to be jointly formed by her and the defendant, that she herself had had no contact with the Manchester Savings Bank in 1955 or 1956, and that she was totally unaware that the bank contemplated giving a mortgage to Meloon personally or that he had told the bank that he would obtain sole title.

It is significant, regarding plaintiff's state of mind, that in the spring of 1956 she had dropped her own business entirely because her youngest daughter, Diana, was severely ill with acute schizophrenia and hospitalized at the Rockland, New York State Hospital. Plaintiff had sub-let her New York apartment during this period to gain addi-

tional income and was living with friends. Between visits to the hospital in New York and trying to take care of the property in New Hampshire and to prepare it for the 1956 rental season, she was in a physically exhausted condition. Her daughter Diana was hospitalized from late May of 1955 until June of 1956. This child had attempted suicide the previous Christmas, but was discharged to plaintiff's custody on short notice in June of 1956. Plaintiff was instructed that Diana was not to be left alone and needed psychiatric supervision. She employed nurses to be with Diana while she was working on a temporary job in Brooklyn, and, at least in part because of the financial stress involved in this domestic situation, she went to New Hampshire to meet defendant to try and complete the details of forming a corporation to operate the real estate and gain income therefrom. She brought the disturbed child with her. She testified that while she was discussing the details of the proposed corporation with Meloon, in the main house at Dublin, she had one ear on this business conversation and one eye on Diana, lest the child disappear into the woods and become lost. It was tentatively agreed between plaintiff and defendant that the realty should be incorporated for $75,000, their agreed valuation of the property.

Upon plaintiff's return to New York she was notified that her oldest daughter, Mark, had been taken by police to Bellevue Hospital suffering from a severe manic-depressive breakdown. While Mrs. Byron was attempting to arrange to transfer Mark from Bellevue to the Rockland State Hospital she left the younger child, Diana, with a nurse. Diana disappeared for three days, during which time she went to Goose Rocks Beach, Biddeford, Maine, and then turned up at her brother's home in Cambridge, Massachusetts. Plaintiff next returned Diana to Dublin, New Hampshire, and then went back to New York in connection with the illness and hospitalization of her daughter Mark. Short-

ly thereafter, she was notified in New York that Diana had taken her life in New Hampshire on July 22, 1956. The funeral was held Wednesday, July 25, in Dublin, New Hampshire.

On Friday, July 27, Meloon asked plaintiff to conclude the mortgage transaction at the Manchester Savings Bank. There, for the first time, she was told by Meloon that she was to convey the real estate to him in his individual capacity, whereupon the Manchester Savings Bank would grant him a first mortgage on the real estate based on its appraisal of the real estate and Meloon's personal financial rating. He further told her that he would then convey the real estate to the corporation they were about to form, subject to the Manchester Savings Bank mortgage.

Mrs. Byron played no part whatsoever in the negotiations with the Manchester Savings Bank for this mortgage. They were conducted solely by the defendant, and plaintiff was surprised and dismayed at his demand that she convey the real estate directly to him in his individual capacity. He explained to her that this was merely a technicality, "red tape" made necessary by the demands of the Manchester Savings Bank, and he assuaged her shock and dismay by assuring her that it made no difference in the long run in the totality of their business relationship since he would convey the realty to the newly formed corporation. He told her that this conveyance would have the effect of putting ownership of the realty back into her, although indirectly, through the medium of the newly formed corporation and her partial stock ownership thereof.

In the course of defendant's negotiations with the Manchester Savings Bank he made a representation in writing to the bank that the purchase price he was paying to plaintiff for the realty was $55,000. This was not true. He also made the representation that the difference between the $33,000 mortgage and the $55,000 purchase price would be paid by him to plaintiff in the cash amount of $22,000. This was not true. Defend-

ant further represented to plaintiff at the Manchester Savings Bank that he expected that the Secretary of State would approve the incorporation papers within a matter of two or three weeks and that he would transfer title to the real estate to the new corporation as soon as the Secretary had approved its incorporation.

I find that plaintiff at that time was in an extremely unstable mental and emotional condition as a result of the double tragedy, the hospitalization of her daughter Mark with a severe manic-depressive breakdown and the suicide of her daughter Diana. This mental and emotional condition was further aggravated by the financial strain of the two hospitalizations, the funeral, and her own personal financial problems.

I find that while in this condition plaintiff relied on and trusted Meloon completely, and accepted at face value that the "sale" to him was just "red tape" and a necessary intermediate step in the process of incorporating the real estate. I find that she executed the bill of sale and deed to Meloon in reliance upon his representations to that effect. I find that she did not understand at that time, or at any other time material to this case, that she was to transfer legal title to defendant as an individual, that at no time did she intend to transfer beneficial title to him, and that her intent at all material times was to transfer naked legal title to the real estate to him only on condition that he convey title to the corporation which was to be formed jointly by him and her for the purpose of financing needed improvements to the property and operating the property on a seasonal rental basis.

After obtaining funds from the Manchester Savings Bank, a check was made out to plaintiff in the amount of the Union Trust Company mortgage and was used to discharge that mortgage. Thereafter, plaintiff and defendant went to the Registry of Deeds, in Keene, New Hampshire, and plaintiff signed a deed conveying the fee in the real estate from her to defendant.

The deed was duly recorded, and on the same day plaintiff received from the Manchester Savings Bank a closing statement relative to the mortgage, together with a check for $13,687.47, the balance of the mortgage proceeds. She remitted $5,600 of this sum to Meloon as reimbursement for various advances he had made to her, including the $2,000 loan he had made to finance improvements to the carriage house.

In September 1956, plaintiff and defendant met again, at the main house in Dublin, to discuss the capital structure of the corporation to be formed by them under the name of Byron Properties, Inc. After this meeting, 600 shares of Class A stock were issued to plaintiff, 1800 shares of Class A stock were issued to defendant, and 1200 shares of Class A stock were issued to Robert L. Johnson, with the understanding between plaintiff and defendant that plaintiff would have the right to vote the 1200 shares in the name of Johnson. 5000 shares of preferred stock were issued to a Mrs. Baker, who had made an unsecured loan of $5,000 to plaintiff.

At this same meeting, Meloon instructed plaintiff that as part of the plan of incorporating the real estate it was expedient for him to lease the property to her. Plaintiff testified "the lease was the shock of that meeting." Meloon advised her that the lease would provide for her to pay a yearly rental of $3,600, that she was to manage the property, sublet both houses, and to apply the rental income to the maintenance of the property. When plaintiff protested that the property had never produced rent in any one year in excess of $1,700, Meloon advised her that this lease was not intended by him to be binding on her but merely to set a rental scale for her guidance and that no demand would be made on her by him or the corporation to actually pay $3,600 per year. He agreed to pay the taxes and monthly interest on the mortgage and look to the corporation for reimbursement therefor. One of the corporate purposes was the eventual sale of the property if the right

price could be obtained. Relying on these representations by Meloon, plaintiff executed a lease of the real estate with Meloon on July 27, 1956. I find that plaintiff's signing the lease was done in complete reliance on the false representations of Meloon; that the significance and legal effect of her so doing would be merely to set out in writing her management duties toward the property and to establish a hoped-for rental level. I find that at no time did she intend to transfer to the corporation actual beneficial ownership of the personal property contained in the various buildings.

Thereafter, Meloon caused the formation of a New Hampshire corporation, called Byron Properties, Inc., which was chartered by the Secretary of State on October 16, 1956. At no time, from October 16, 1956 to date, did Meloon ever convey any real estate to Byron Properties, Inc., nor did Mrs. Byron, at any time from October 16, 1956 to date, ever convey any personal property to Byron Properties, Inc.

Despite this total lack of either real or personal property, Meloon filed with the Secretary of State, on April 2, 1957, a "Statement of Condition as of January 1, 1957 for Byron Properties, Inc.," in which he reported under oath that Byron Properties, Inc. had real estate worth $56,000 and personal property worth $18,000, or total assets of $74,000. This report was false and fraudulent as to both the real and the personal property. A second false Certificate of Condition as of January 1, 1958 was filed on June 1, 1958. However, on March 30, 1959, Meloon filed a Statement of Condition as of January 1, 1959 showing the corporation as having no assets, no liabilities, and zero net worth. Subsequently the corporation was dissolved.

It appears that although plaintiff co-signed with Meloon both the Certificate of Condition for January 1, 1957 and the Certificate of Condition for January 1, 1958, her signatures were placed thereon by her in New York when the forms were still blank and that they were then mailed by her to defendant who filled them in and caused them to be filed. More importantly, I find that at the time she signed these forms, whether or not they were in blank, she was not aware that Meloon had failed to convey the real estate to the corporation as he had promised to do, and that she did not learn until the spring of 1960 that Meloon had retained title to the real estate in himself. This information came to her attention in the course of a dispute between him and her over certain timber-cutting on the property when, for the first time, he unequivocally told her that due to his sole ownership of the real estate he could cut such timber thereon as he chose to do. He subsequently ordered her off the premises.

■ This opinion could be prolonged interminably were all of the rather peculiar and non-businesslike incidents and transactions between plaintiff and defendant recited herein. Suffice it to say that on the basis of the facts found above, I find and rule that defendant induced plaintiff to convey to him a parcel of realty worth $60,000 by the series of fraudulent misrepresentations described above which were relied on by her and which were known by him to have been false and fraudulent when made.

■ I rule that defendant's conduct toward plaintiff, recited above, constitutes actionable fraud under the law of the State of New Hampshire, Hall v. Merrimack Fire Insurance Company, 91 N.H. 6, 13 A.2d 157 (1940), because on the facts found defendant has made material representations to plaintiff which were false and known by defendant to be false when made, and which were made for the purpose of causing plaintiff to act in reliance thereon, and which plaintiff in fact did rely on, to her detriment. Procuring a conveyance of real property by means of fraudulent representation is an actionable tort under the law of New Hampshire. Moore v. Roxbury, 85 N.H. 394, 159 A. 357 (1932). Plaintiff is entitled to an election among several reme-

dies under New Hampshire law which, of course, governs in this diversity case. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L. Ed. 2079 (1945). One of the remedies which plaintiff is entitled to elect is to claim money damages for the loss which she sustained as a direct result of defendant's fraud. Brown-Wales Co. v. Barber, 88 N.H. 103, at 107, 184 A. 855, at 858 (1936), where Judge Woodbury ruled:

> "For fraudulent misrepresentation one is entitled to recover from its maker the loss which he has sustained by reason of his action or inaction upon it. Or, as stated in Hotaling v. A. B. Leach & Company, 247 N.Y. 84, 159 N.E. 870, 57 A.L.R. 1136, 'The rule is general that actual pecuniary loss sustained as a direct result of the wrong is the measure to be applied in fixing damages.' "

Election of this remedy by plaintiff confirms title in the real estate to defendant. Todd v. Duncklee, 94 N.H. 226, 52 A.2d 285 (1946).

I compute plaintiff's damages herein as follows: the fair market value of her real estate in Dublin, New Hampshire, on July 27, 1956, was $60,000. Her equity therein, after deducting $19,235, the amount of the outstanding mortgage to the Union Trust Company, Concord, New Hampshire, was $40,765. Plaintiff claims that she is entitled to credits for various expenditures in connection with this property, detailed in Plaintiff's Exhibit 15, in the amount of $11,435, less $6,600 representing the rental income she received from the property during the years 1957 through 1963, reducing her out-of-pocket expenditures to $4,834. I am not persuaded that Exhibit 15 is accurate and I find that her out-of-pocket expenditures are exaggerated in Exhibit 15 and that they amounted to $6,600, the amount she received in rentals. Thus, these two items, out-of-pocket expenditures and rental income, cancel each other.

Plaintiff concedes and I find that defendant is entitled to a total credit of $16,704, made up of $13,687, the proceeds received by her from the Manchester Savings Bank on July 27, 1956, plus $3,017 due and owing to defendant from her on account of various advances. Thus I determine and find her net damages by subtracting $16,704, representing the credit to which defendant is entitled, from $40,765, representing the cash value of plaintiff's equity of redemption in the property, and arrive at the figure of $24,061 which I find to be the net damage suffered by plaintiff as a direct consequence of defendant's wrongful conduct.

Judgment accordingly.