### The MANCHESTER BANK

v.

### CONNECTICUT BANK AND TRUST COMPANY.

Civ. No. 78–68–D.

United States District Court, D. New Hampshire.

Sept. 24, 1980.

banking corporation, and seeks to recoup losses arising from its participation in a loan with defendant, Connecticut Bank and Trust Company ("CBT"). The loan was designed to assist a newly formed business, New England Pulp and Paper, Inc. ("NEPP"), in its efforts to produce newsprint from recycled waste paper.

Plaintiff claims violations of federal and state securities laws and regulations, and causal common law fraud, deceit, negligent misrepresentation, breach of fiduciary duties, and breach of contract. In addition to diversity, 28 U.S.C. § 1332, jurisdiction is purportedly grounded upon the Securities Act of 1933, 15 U.S.C. § 77v, the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, 15 U.S.C. § 78j, and the New Hampshire securities statute, RSA 421.

At this juncture of the proceedings, the Court addresses the resolution of certain issues arising from various motions including cross–motions for summary judgment. The Court has heard oral argument of counsel and has reviewed the depositions, interrogatories, affidavits, legal memos, pleadings, and other documents on file. For the purposes only of its decision on the issues currently pending, the Court hereinafter outlines the facts upon which the parties rely.

### I. Factual Background.

Nutmeg Commercial Corporation ("Nutmeg") was incorporated in Connecticut as a sister corporation of CBT in April of 1973 for the purpose of handling commercial financing. In September 1973 Nutmeg loaned to Profile Paper Company the sum of $1.1 million to purchase and operate a paper mill situated in Lincoln, New Hampshire. This mill was owned by Green Acre Realty and Black Acre Realty Corporations, and Black Acre took a second mortgage on the real estate premises. Profile defaulted in December of 1974, at which time Nutmeg entered into possession of the premises. CSP Corporation was formed by Nutmeg for the purpose of acquisition and disposal

Jack B. Middleton, Manchester, N. H., for plaintiff.

Michael C. Harvell, Manchester, N. H., for defendant.

### MEMORANDUM OPINION

DEVINE, Chief Judge.

This commercial litigation has its source in the combined efforts of two banking institutions to rejuvenate an abandoned paper making facility situated in Lincoln, New Hampshire. Plaintiff, The Manchester Bank ("TMB"), is a New Hampshire

of the real estate, and it purchased same on March 17, 1975, at a foreclosure sale held by Black Acre Realty Corporation. In April 1975 Nutmeg purchased the machinery and equipment in the mill at a public sale which was held on the premises.

In the summer of 1975, certain businessmen approached Roger Keefe, a vice president of CBT, relative to their proposal that CBT finance their acquisition of the mill in Lincoln in order that they might go forward with the manufacture of newsprint from recycled waste paper. The proposal was presented to the loan policy committee of CBT on August 14, 1975, at which time formal action was deferred as it was the concensus of the committee that the underwriting should be substantially improved prior to booking the loan. Additionally, two members of the committee specifically requested to be recorded against the proposed loan, voicing their opinion that the loan did not meet the normal credit standards of CBT.

Nevertheless, in September of 1975 the proposed investors having formed NEPP and produced approximately $1 million in equity capital, CBT granted to NEPP a loan for the purpose of purchasing the mill assets and engaging in the necessary activity to convert the mill to the manufacture of newsprint. The funds loaned by CBT consisted of a $3 million term loan and a $750,-000 revolving credit loan.

Also in September 1975 CBT decided that they would seek participation in the loan from a New Hampshire bank, contending that this would allow them to have a local bank with better knowledge of local conditions and problems and ease of supervision, the provision of local credit reference for NEPP, and the provision of local payroll service for NEPP. TMB disputes these reasons, contending that the evidence available will demonstrate that it was not until after the loan committee disapproved the loan that participation was considered and it was then thought desirable to have a New Hampshire bank participate to add an "arm's length" dimension to the previous interaffiliate dealings with Nutmeg.

The initial approach by CBT was made to the Indian Head Bank of Nashua, which upon review declined participation in the term loan, although it indicated an interest in participating in the revolving credit loan once the mill was successfully in operation. CBT requested NEPP's assistance in finding another local bank to participate, and NEPP's local counsel then made telephone contact with TMB's chief executive officer in early October. Subsequent meetings were held between officials of CBT and TMB, TMB's loan people visited the Lincoln mill and talked with various principals of NEPP, and TMB generally reviewed the prospects of the proposal from CBT, which was that it purchase one sixth, or $500,000, participation in the $3 million term loan.

It appears that if successful the NEPP operation of manufacturing newsprint from recycled waste paper would be one of only three such operations in the entire United States. NEPP had a substantial supplier of waste paper, but the process of manufacture depended for its success upon certain engineering suggestions from Rust Engineering Company, requiring the installation of various "deinking" machines which were to remove the ink from the waste paper and allow it to become clean for reuse. This was an expensive and apparently experimental process, and very costly to install and attempt to operate. NEPP therefore ran through its $3 million term loan in a very short period of time, and it became necessary for CBT to advance another $500,000 due largely to the fact that a boiler, which it was thought could be leased, had to be purchased. Accordingly, CBT requested TMB to restructure its participation to accept one seventh of what was now a $3.5 million loan.

Commencing January 23 and through February 4, 1976, TMB in a series of installment payments purchased participation certificates totalling $500,000 in the term loan from CBT to NEPP. TMB understood that it was going to be in a first priority position and also understood that the assets secured were sufficient to reimburse it in the event of any problem. However, on February 4,

1976, NEPP was already in an overdraft status, which eventually grew to $1,600,000. By the end of March, the situation at the mill was desperate, and after several shutdowns, it finally closed in June of 1976.

On July 2, 1976, TMB requested CBT to give notice to NEPP and commence action to control the collateral. CBT assured TMB that there was adequate security, and it subsequently took possession of the mill on July 27, 1976. Despite repeated demands from TMB that CBT foreclose, no foreclosure was held until September 16, 1977, although during the interim attempts were made by CBT to sell the mill to other paper manufacturers. At foreclosure, CBT purchased the property with a $100,000 bid, to which TMB's counsel objected, and the mill was subsequently sold in the fall of 1978 for $1.3 million, of which $250,000 represented a CBT participation in loans advanced to the purchaser by Irving Trust Company.

## II. The Issue of Whether the Participation Certificates Constitute "Securities".

Count I of the complaint seeks to recover for alleged violations of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j)[1] and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5.[2] CBT urges that the participation interests which it sold to TMB do not constitute "securities" within the contemplation of this statute and rule, and therefore argues that summary judgment should be entered in its favor with reference to Count I.

Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) provides:

(a) When used in this chapter, unless the context otherwise requires—

. . : . .

(10) The term 'security' means any note, stock, treasury stock, bond, debenture, *certificate of* interest or *participation in* any profit–sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral–trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting–trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any *certificate of* interest or *participation in*, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

(Emphasis supplied.)

Both of the parties herein indicate that they follow and rely upon the "Guidelines For Upstream Downstream Correspondent

---

1. 15 U.S.C. § 78j provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Bank Loan Participations" (hereinafter "Participation Guidelines") prepared by Robert Morris Association of Philadelphia in November of 1975. In pertinent part, these Guidelines state

> The third Guideline dealing with the two–way flow of information about the borrower calls for complete candor and the full sharing of facts throughout the life of the loan. Actually, the drafters of this Guideline were led by an opinion handed down in the case of *Lehigh Valley Trust Co. v. Central National Bank of Jacksonville*, 409 F.2d 989 (1969), in the Fifth Circuit United States Court of Appeals, which holds that a loan participation agreement between banks is a 'security' under the Securities Exchange Act of 1934 and that Rule 10b–5 thereunder applies . . . .

Plaintiff, originally relying on *Lehigh Valley, supra,* urged that its "literal" reading of the pertinent provisions of the statutory definition are to be here applied, as the rule of *Lehigh Valley* was "clearly the law of the Fifth Circuit". Defendant countered by arguing that the decision in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), has made clear that *Lehigh Valley* is no longer good law and should not be followed in the instant action.

In *Lehigh Valley, supra,* the defendant Central National Bank of Jacksonville, Florida, had for a long time loaned substantial sums of money to one Von Zamft who was the principal of several corporate enterprises including Larso Development Company. Central Bank had apparently made a number of poorly secured loans to Von Zamft and had tried to "bail out" these bad loans by making new loans to some of his newer corporations. At one point ten percent of the bank's assets were committed to Von Zamft Enterprises, and at about this time Larso Development needed a substantial loan in the amount of $325,000 from Central Bank. Central Bank was able to lend only $185,000, but sold participation interest to others, including Lehigh Valley Trust Company. Prior to entering into a participation agreement, Lehigh Valley contacted Central Bank and was advised that Larso Development was sound, that the note was secured by valuable stock shares, and that the guarantors were high quality customers who were a good risk. Information as to Central's prior unfortunate dealings with Von Zamft were not disclosed to Lehigh, and in upholding a verdict for Lehigh, the Fifth Circuit pointed out that situated as it was in Pennsylvania, Lehigh Valley "had no way to independently verify the information supplied by Central Bank which was on intimate terms with the borrower, consequently it had to rely upon the truth of the recommendations of Central Bank." 409 F.2d at 993. As "almost all notes are held to be securities", 409 F.2d at 992, the court chose to read the statutory definition literally in holding that the participation agreement was within the thrust of the statute and Rule 10b–5.

However, totally apart from the fact that here, unlike *Lehigh Valley*, plaintiff TMB was the bank situated in New Hampshire and closest to the operation to which the loan was to be extended, and caused its loan officer to visit the mill premises on three separate occasions before agreeing to participate, it is quite doubtful that *Lehigh Valley* was, at the time of the transactions which gave rise to the instant litigation, "clearly the law of the Fifth Circuit".

> With the exception of the early case of *Lehigh Valley Trust Company v. Central National Bank of Jacksonville,* 409 F.2d 989 (5th Cir. 1969), the Fifth Circuit has consistently followed the investment/commercial test of *Sanders* [*v. John Nuveen & Co., Inc.,* 463 F.2d 1075 (7th Cir. 1972)] and *Zeller* [*v. Bogue Electric Manufacturing Corporation,* 476 F.2d 795 (2d Cir. 1973)]. In both *Securities and Exchange Commission v. Continental Commodities Corporation,* 497 F.2d 516 (5th Cir. 1974) and *Bellah v. First National Bank of Hereford, Texas,* 495 F.2d 1109 (5th Cir. 1974), the Fifth Circuit applied the investment/commercial test to find that notes of less than nine months duration were securities within the meaning of the Securities Exchange Act of 1934.

*First Federal Savings and Loan Association v. Mortgage Corp. et al.*, 467 F.Supp. 943 at 948 (N.D.Ala.1979).

Defendant CBT takes the position that this issue is governed by and to be disposed of in accordance with *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), wherein it was held that stock in a low–income housing nonprofit corporation was not a "security" within the meaning of either the 1933 or 1934 Acts.[3] The Court pointed out that with the exception of the Second Circuit, every court of appeals recently to consider the issue had rejected the "literal" approach to the definition of a security, 421 U.S. at 849, n. 14, 95 S.Ct. at 2059, n. 14, and stressed that it was the "economic realities" underlying the transaction which were of import. 421 U.S. at 850, 95 S.Ct. at 2059. The Court went on to say, however (421 U.S. at 850–51, 95 S.Ct. at 2059–60),

> In holding that the name given to an instrument is not dispositive, we do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as 'stocks' or 'bonds' will lead a purchaser justifiably to assume that the federal securities laws apply. This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument.

The confusion arising from the apparent multiplicity of approaches to the definition of "security", *e. g., Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976) (suggesting that taking full account of the anti–literalist approach of *Forman, supra,* the best available alternative might lie in greater recourse to the statutory language and setting forth

specific examples of items that would not constitute "securities") has scarcely been clarified by the approach of the prestigious American Law Institute to its proposed new Federal Securities Code. Therein it has been suggested that excluded from the definition of "security" should be "a note or evidence of indebtedness issued in a primarily mercantile or consumer, rather than investment, transaction not involving a distribution . . . ." § 299.53(b), Federal Securities Code, Proposed Official Draft 1978, p. 158. The explanation is that the proposed exclusion would codify the mercantile–investment dichotomy "that is emerging as *the least imperfect solution* to a troublesome problem". *Id.* at 159. And, unfortunately, in its last brush with this problem, the First Circuit was in a position to find that the questioned "loan plans" of a purported religious organization fell squarely within both the literal statutory language and the test set forth in *Forman, supra. Securities and Exchange commission v. World Radio Mission, Inc.*, 544 F.2d 535, 537–38 (1st Cir. 1976).

However, the fact that the First Circuit has not made clear a definite position as to the test to be applied in determining what sort of transaction involves a "security", does not long detain us, for a review of recent decisions leads the Court to conclude that the participation agreements herein are not "securities" within the meaning of the statute or SEC rule and that Count I must therefore be dismissed for lack of jurisdiction in this forum.

 As indicated, the modern rulings of federal courts take the position that the Supreme Court in *Forman, supra,* and in *Securities and Exchange Commission v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), have articulated the tests by which a financial transaction is to be ana-

---

**3.** The definition of "security" in § 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10) is virtually identical with the definition contained in § 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), and the courts have therefore generally held that the coverage of the two Acts may be regarded as the same. *Teamsters v. Daniel*, 439 U.S. 551, 556 n. 7, 99 S.Ct. 790, 794 n. 7, 58 L.Ed.2d 808

(1979); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2057, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967). *See also Lawrence v. Securities and Exchange Commission*, 398 F.2d 276, 279 n. 4 (1st Cir. 1968).

lyzed in order to determine if a "security" is involved. The four elements of such analysis pursuant to *Howey–Forman* are: (1) the presence of an investment; (2) a common venture; (3) a reasonable expectation of profits; and (4) such profits are to be derived from the entrepreneurial or managerial efforts of others. *Forman, supra,* 421 U.S. at 852, 95 S.Ct. at 2060. As the Court has elsewhere observed, in searching for the meaning and scope of the word "security", form is to be disregarded in favor of substance, with the emphasis placed on economic reality, *Tcherepnin v. Knight, supra,* 389 U.S. at 336, 88 S.Ct. at 553. Not "every conceivable arrangement that would fit a dictionary definition of an investment contract was intended to be included within the statutory definition of a security". *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274, 275–76 (7th Cir.) (opinion by then Judge, now Justice Stevens), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). *Cf. Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 622 F.2d 216, 222 (6th Cir. 1980).

▮▮▮ A pension plan does not constitute a security. *International Brotherhood v. Daniel,* 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). A certificate of deposit is similarly not a security (*Canadian Imperial Bank of Commerce v. Fingland,* 615 F.2d 465 [7th Cir. 1980]), nor is a short–term note given a lender in the course of the financing of a shopping center development. *Amfac Mortgage Corporation v. Arizona Mall of Tempe,* 583 F.2d 426 (9th Cir. 1978). Similarly, the investments of limited partners, *Stowell v. Ted S. Finkel Investment Services, Inc.,* 489 F.Supp. 1209 (S.D. Fla.1980), and residency shares in a retirement center, *Aschenbach v. Covenant Living Centers–North,* 482 F.Supp. 1241 (E.D. Wis.1980), do not constitute securities.

More importantly, however, the Fifth Circuit has now clearly rejected its holding in *Lehigh Valley Trust Co. v. Central National Bank, supra,* in the context of a participation agreement, stating:

As to the issue of whether the plaintiff's participation in the Gunter note is a security under the Securities Act and the Exchange Act, the Court rejects the plaintiff's contention that the participation interest is by definition a security because of the Fifth Circuit's holding in *Lehigh Valley Trust Co. v. Central National Bank,* 409 F.2d 989, 992 (5th Cir. 1969). The Supreme Court has rejected the literal approach employed by the court in the *Lehigh Valley Trust Co.* case and has consistently counseled that the application of the federal securities statute turns on the economic realities underlying a transaction. *Forman,* 421 U.S. at 849 [95 S.Ct. 2051, 44 L.Ed.2d 621]; *Tcherepnin v. Knight,* 389 U.S. 332, 336 [88 S.Ct. 548, 553, 19 L.Ed.2d 564] (1967); *Howey,* 328 U.S. at 298 [66 S.Ct. at 1102] (1946). The Fifth Circuit has also rejected the ritualistic application of the federal securities laws and has focused, in recent cases, on whether the transaction at issue is commercial or investment in nature. *See, e. g., National Bank of Commerce,* 583 F.2d [1295] at 1301; *McClure,* 497 F.2d [490] at 495; *Bellah,* 495 F.2d at 1113. It is therefore appropriate for this Court to employ the 'economic realities' approach embodied in the *Howey–Forman* test in determining whether the plaintiff's loan participation is a security.

*United American Bank of Nashville v. Gunter,* 620 F.2d 1108 at 1115 (5th Cir. 1980).[4]

▮▮ In the instant case, it is clear that repayment of such funds as TMB advanced to the participatory agreement plus interest thereon was not dependent upon the success or failure of CBT, but was a function of the success of the deinking process to make saleable recycled newsprint, *i. e.,* the ability of NEPP to repay the loan, and of the collateral available to secure the loan in the event that NEPP failed in its efforts. The only funds TMB expected to receive as a

4. The language above quoted from *Gunter* is taken from Appendix A, which in turn is the decision of the district court. In its *per curiam*

affirmance, the Court of Appeals stated it was adopting the reasoning of the district court and appended its decision as part of its opinion.

result of its participation were the principal funds of $500,000 which it advanced, plus the interest, which might fluctuate somewhat solely as a result of the prime rate. The participation agreement did not grant to TMB any right to share in any profits which might accrue to CBT.

TMB does not apparently distinguish between participatory and direct loans, and herein its loan was approved by the same officers who normally pass on such direct loans. Commercial loans of this type are clearly distinguished from investments by TMB's policies, and as between TMB and CBT at the time the participation agreements were entered into it was considered to be clearly a loan in which CBT was the lead lender. The loan had apparently substantial collateral, and at the time it entered into the participation agreement, TMB was satisfied with the information as to this collateral furnished by CBT and did not choose, though it had the opportunity to do so, to seek an independent appraisal of the assets which made up the collateral.

As to profits, the law is clear that the expectation of appreciation in the value of an investment, or a variable rate of return, are indicative of security status. *Gunter, supra,* at 1117. Here, however, the interest paid would fluctuate only with the prime rate and there was no other anticipated appreciation in the value of TMB's participation, leading the Court to conclude that "there was no reasonable expectation of profit either over and above or of a different nature than that found in a commercial lending transaction". *Id.*

And as for the requirement that the profits be derived from the entrepreneurial or managerial efforts of others, the Court must reject TMB's argument that this refers to the efforts of CBT, the lead lender. Although CBT is clearly responsible for performing certain administrative and management services for the loan participants, such services are not entrepreneurial within the meaning of the *Howey–Forman* test. The interest which was hopefully to be paid to the participants here was to be derived from the efforts of Rust Engineering in perfecting the deinking process so that in turn NEPP could sell at a profit the recycled newsprint. As indicated, these entrepreneurial efforts were unsuccessful and contributed to the losses of which TMB complained, but they were not the efforts of CBT, and therefore the legal test of *Howey–Forman* has not been met, and the participation agreements which are the subject of this litigation clearly do not constitute "securities" as that term is used in the applicable statute and regulations.

> This is yet another attempt to convert the securities laws into something which they are not. The securities laws do not afford general relief when commercial loans turn out to have been unwisely made, nor are they a source of general federal jurisdiction ... (cit. omitted) ....

*Amfac Mortgage Corp. v. Arizona Mall of Tempe, supra,* at 428.

For the reasons hereinabove outlined, the Court finds and rules that it lacks jurisdiction under the securities laws and regulations of the claims set forth in Count I of the plaintiff's complaint, and accordingly summary judgment is herewith entered for the defendant on said Count I.

*III. The Issue of Whether There Is A Private Right of Action Pursuant to Section 17(a) of the 1933 Securities Act.*

Count II of the complaint seeks recovery for alleged fraudulent and untrue statements of fact made by CBT to TMB. The statute upon which this count is grounded, 15 U.S.C. § 77q, provides

> (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Although the First Circuit has not as yet addressed the issue of whether the above statute gives rise to a private cause of action, our distinguished colleague in the District of Maine, Judge Gignoux, in a thorough and well–crafted Opinion, has clearly pointed out that the statute was intended only to afford a basis for injunctive relief, and, if willfulness is present, for criminal liability, and was not intended to provide a civil remedy for damages. *Dyer v. Eastern Trust and Banking Company,* 336 F.Supp. 890 at 903–05 (D.Me.1971). We have been persuaded on previous occasions that this view is a correct one and our opinion has subsequently been bolstered by the actions of other courts which have followed suit. *See Rispo v. Spring Lake Mews, Inc.,* 485 F.Supp. 462 (E.D.Pa.1980); *Woods v. Homes & Structures of Pittsburg, Kansas,* 489 F.Supp. 1270 (D.Kan.1980); *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069 (N.D.Cal.1979).

As we have already held that the transactions herein do not constitute "securities" and as, following the rule in *Dyer, supra,* we also hold that there is no private cause of action for damages under 15 U.S.C. § 77q, the defendant's motion for summary judgment on Count II of the complaint must likewise be granted.

### IV. The Issue of the Disclaimer Contained In the Participation Certificate.

The participation certificate executed by the parties stated in pertinent part:

4. In consideration of the issue hereof and by acceptance of this participation certificate, it is expressly agreed that the Bank acts only as agent for the collection of principal and interest thereof for the ratable benefit of the participants and shall be free from all other liabilities.

. . . . .

6. The Bank makes no representation or warranty, and shall have no responsibility, as to the validity or collectability of the loan, or of any note or instrument evidencing the loan, or of any loan agreement relating thereto or as to the validity, sufficiency of, or title to, any security therefor, or as to financial condition of the borrower.

For reasons unclear,[5] CBT cites New York law [6] in support of its argument that Counts I–VI of the complaint should be dismissed because the disclaimers above set forth serve to prove that TMB did not justifiably rely on any representations made by CBT. It is clear that application of the pertinent rules of law and the existence of disputed issues of fact would bar summary judgment with respect to this claim.

It is established law in New Hampshire that every agreement contain "an implied covenant that each of the parties will act in good faith and deal fairly with the other." *Bursey v. Clement,* 118 N.H. 412, 414, 387 A.2d 346, 347–48 (1978). "That obligation requires that if one party makes a representation of a material fact to another party for the purpose of inducing the other party to change his position or enter into a contract, the party making the representation must tell the truth." *Id.,* (citations omitted).

---

5. The instant action involves litigation between a Connecticut bank and a New Hampshire bank, the situs of which is a federal court in New Hampshire. That court is required to follow the choice of law rules of the state wherein it sits. *Klaxon Company v. Stentor Electric Manufacturing Company,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under such New Hampshire law, whether for breach of contract, *Consolidated Mutual Insurance Company v. Radio Foods Company,* 108 N.H.

494, 240 A.2d 47 (1968), or tort, *Clark v. Clark,* 107 N.H. 351, 222 A.2d 205 (1966), it is clear that the "most significant contact" here is with New Hampshire and that its law would be applicable.

6. *NBI Mortgage Investment Corporation v. Chemical Bank,* CCH Securities Reporter ' 96,-066, p. 91, 799 (S.D.N.Y.1977); *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

In the progenitor of the above–outlined rule, *Maxwell Ice Company v. Brackett, Shaw & Lunt Company*, 80 N.H. 236, 116 A. 34 (1921), the plaintiff contracted with the defendant for the purchase of a certain 45–horsepower kerosene engine intended to power the plaintiff's portable sawmill. The agreement between the parties provided, *inter alia*, that if the 45–horsepower engine did not perform properly, plaintiff could exchange it for a 65–horsepower engine. The 45–horsepower engine did not perform as promised and, following a period of shutdown of the sawmill, it was exchanged for the 65–horsepower engine. Plaintiff sued for false representations on the part of defendant, and the court rejected the defendant's contention that the agreement to exchange engines barred the recovery of damages. It was not to be assumed that the parties mutually contemplated and provided a remedy for actionable misrepresentations by the agreement, and the extent to which the plaintiff was damaged by his reliance upon the defendant's misrepresentations was a question of fact. 80 N.H. at 242. New Hampshire continues to follow this rule of law. *See Mertens v. Wolfeboro National Bank*, 119 N.H. —, 402 A.2d 1335, 1337 (1979).[7]

If, as TMB asserts, its proof will demonstrate that CBT violated every standard of bank practice and good faith dealings by selling to TMB a loan that its own senior people found unacceptable, then there are obviously disputed genuine issues of material fact. The Court therefore concludes that both law and the existence of such issues require denial of the motion for summary judgment grounded on the disclaimer language in the participation certificates.

### V. The Applicability of the "Blue Sky" Law, New Hampshire Revised Statutes Annotated Chapter 421.

TMB seeks to recover in Count III of its complaint for alleged violations of RSA 421, the "blue sky" law[8] of New Hampshire. RSA 421:2 (1979 Supp.) includes in its definition of "securities": "all classes of stocks and shares, bonds, debentures, evidences of indebtedness and *certificates of participation* . . . ." (Emphasis supplied.)

Administered by the Insurance Commissioner of New Hampshire, the purpose of RSA 421 is to prohibit sales or offers to sell or solicitation of sales of securities except by a registered dealer or salesman. *Doherty v. Bartlett*, 81 F.2d 920, 927 (C.C.A. 1), *rehearing denied*, 83 F.2d 259, *cert. denied*, 298 U.S. 676, 56 S.Ct. 941, 80 L.Ed. 1398 (1936). The New Hampshire courts have not as yet expounded on the issue of whether the language we have hereinabove emphasized would include participation agreements such as those at issue in the instant litigation. Courts elsewhere, however, have adopted the *Howey–Forman* test,[9] and it is clear for such reasons we have previously outlined (pp. 1311–1313, *supra*) that such agreements would not fall within the definition of "securities" set forth in the New Hampshire statute. Moreover, the affidavit of Frank Giacoumis, supervisor of the securities division of the office of the Insurance Commissioner of New Hampshire (Exhibit F attached to CBT's initial memo in support of its motion) clearly demonstrates that participation agreements of the type here at issue are not considered to be "securities" within the meaning of RSA 421.

The Court accordingly finds and rules that CBT is entitled to summary judgment on Count III of the complaint herein.

---

**7.** Indeed, were the Court to hold that the law of New York was here applicable, it would appear that the proper rule of law to be applied in this case would be that set forth in *Goldsmith v. National Container Corporation*, 287 N.Y. 438, 40 N.E.2d 242 (1942), which is identical with the rule as set forth in *Mertens, supra*. Additionally, it is elementary New York law that any contract can be set aside for fraud. *Horwitz v. Sprague*, 440 F.Supp. 1346, 1350 (S.D.N.Y.1977).

**8.** The term "blue sky" derives from the fact that such statutes are intended to prevent "speculative schemes which have no more basis than so many feet of 'blue sky' ". *Hall v. Geiger–Jones Co.*, 242 U.S. 539, 550, 37 S.Ct. 217, 220–21, 61 L.Ed. 480 (1917).

**9.** *See* Annotations at 47 A.L.R.3d 1375; 84 A.L. R.3d 575; 84 A.L.R.3d 1009.

### VI. The Issue of a Fiduciary Relationship.

TMB alleges in Count V of its complaint that CBT by virtue of its position and conduct as the originating lender and lead bank was a fiduciary or trustee for the benefit of TMB, and that, having failed to exercise the care required of an entity in such position, it is legally responsible to TMB. The thrust of this argument is to the effect that, inasmuch as TMB was completely dependent upon the actions and good faith of CBT but had no rights under the terms of the participation agreements to alter or influence the conduct of CBT— and CBT disregarded TMB's urging to foreclose when the deal went sour—the relationship between the parties is that of a fiduciary or quasi–fiduciary. TMB has expert testimony available to the effect that the relationship between it and CBT was of such character and, perceiving that there are genuine issues of material fact, the Court concludes that summary judgment would not be warranted as to Count V.

In New Hampshire a "fiduciary or confidential relation" is held to exist wherever influence has been acquired or confidence has been reposed and betrayed. The trend is toward liberalization of the concept for the purpose of preventing unjust enrichment. *Cornwell v. Cornwell*, 116 N.H. 205, 356 A.2d 683 (1976); *Powley v. Lessard*, 117 N.H. 991, 380 A.2d 681 (1977); *In re Estate of Lunderville*, 119 N.H. 308, 401 A.2d 1073 (1979). To establish the existence of such relationship there must be proof that one party is justified in believing that the other party will act in its interest. *Wheelen v. Robinson*, 117 N.H. 1032, 381 A.2d 742 (1977). The relationship is generally marked by a disparity in position, *Clooney v. Clooney*, 118 N.H. 754, 394 A.2d 313 (1978), and evidence of its existence must be "clear and convincing". *Id.*

In sum, while TMB carries a heavy burden on the existence of and breach of any fiduciary duty on the part of CBT, it is clear that the issue presented is one for the trier of fact, *Roberts v. Sears Roebuck & Company*, 573 F.2d 976, 983 (7th Cir.), *cert.* denied, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978), and that summary judgment as to Count V of the complaint is not warranted because of the existence of a genuine dispute as to material facts.

### VII. The Issues of Fraud and Misrepresentation.

Inasmuch as we have held that issues of triable fact bar the granting of summary judgment as to the existence of a fiduciary or confidential relationship between the parties it follows that there are similarly factual issues of merit which require jury determination as to the plaintiff's claim of fraud and misrepresentation. By way of example only, plaintiff cites in its original memorandum of points and authorities on pages 42 and 43 some eleven instances of alleged active misrepresentation on the part of CBT, all of which are supported by interrogatory, deposition, or affidavit. Additionally, TMB has presented evidence which tends to prove that NEPP was in an overdraft status which was known to CBT as of the date TMB agreed to participate in the loan (Anderson affidavit of July 3, 1980).

The law is clear in New Hampshire that a fraudulent representation, as distinct from a negligent one, must have been made either with knowledge kof its falsity or a conscious indifference to its truth. But in addition to deliberate falsehood, it must appear that the false statement was made for the purpose and with the intention of causing the other party to act upon it. *Hall v. Merrimack Mutual Insurance Company*, 91 N.H. 6, 13 A.2d 157 (1940); *Byron v. Meloon*, 287 F.Supp. 574 (D.N.H.1968). Furthermore a representation which was true when made could be fraudulent if the maker failed to disclose subsequent information which made the original representation a false one. *Maxwell Ice Company v. Company*, 80 N.H. 236, 239, 116 A. 34 (1921); *Bergeron v. Dupont*, 116 N.H. 373, 359 A.2d 627 (1976). And if a false statement is made recklessly with a conscious indifference to its truth and without considering whether it is true or false,

its fraudulent charter is made out. *Saidel v. The Union Assurance Society*, 84 N.H. 232, 149 A. 78 (1930).

Here, TMB claims that CBT's representative, Bilbao, made certain representations and set forth certain opinions regarding the NEPP loans which were not honestly held by him in view of the fact that CBT had seen the loan rejected by its own loan policy committee which was adverse to the transaction. TMB also contends that its evidence supports the fact that CBT had strong ulterior motives for soliciting a participant in the wake of the loan policy committee's rejection, and that CBT desired TMB to join in the transaction largely to construct the appearance of "an arm's length" relation with its affiliate Nutmeg.

It would unduly prolong this Opinion to review each of the disputed issues of material fact, but it should suffice to point out that the Court finds and rules that such exist and that therefore the defendant's motion for summary judgment grounded on plaintiff's claims of fraud and misrepresentation must be denied.

### VIII. Plaintiff's Motion for Summary Judgment as to Count VII of the Complaint.

■ On April 2, 1979, TMB moved to amend its complaint to add Count VII for breach of contract wherein it seeks recovery of a proportionate share of the proceeds of a sale of the real estate collateral, which sale was held by CBT in November of 1978. The motion to amend was granted without objection, and plaintiff subsequently moved for summary judgment as to Count VII and again, there being no objection interposed, the motion was granted pursuant to Local Rule 11. CBT subsequently moved to vacate because of accident, mistake, and misfortune, pointing out that it was proceeding pursuant to Rule 56, Federal Rules of Civil Procedure, and in the process of preparing affidavits in contravention of the motion. Upon examination of the affidavits and documents submitted by the respective parties, the Court concludes that there are genuine issues of material fact as to Count

VII of the complaint, and accordingly grants the defendant's motion to vacate the previously entered order, and denies plaintiff's motion for summary judgment as to that count.

### IX. The Motion of CBT to Stay Proceedings.

Currently pending in the Superior Court of Grafton County is a case entitled *New England Pulp and Paper, Inc. v. Rust Engineering Company and Black–Clawson Company*. Contending that trial of this case is scheduled for either December 1980 or January 1981, and that resolution thereof if successful will result in funds flowing to CBT which in turn will assure payment to TMB, CBT here seeks stay of the instant action in this court pending final determination of the action in state court. TMB objects, pointing out that the instant action is scheduled for trial herein during the month of November 1980, and pointing out that even were the plaintiff successful in the state court action, further appeal would probably delay the ultimate resolution of the issues therein.

■ CBT relies on the June 26, 1980, decision of Judge Loughlin in *Corinthian Pool Corporation v. National Northeast Corporation*, 492 F.Supp. 928 (D.C.). In that case, the initial suit had been brought by National in a Massachusetts state court and Corinthian, defendant therein, counterclaimed and then sued in this court, setting forth as its cause of action the same basis as was contained in its counterclaim. Noting the rule in this Circuit, *Taunton Gardens Company v. Hills*, 557 F.2d 877 (1st Cir. 1977), to the effect that, as set forth in *Landis v. North American Company*, 299 U.S. 248, 255, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936), there is a heavy burden on the party requesting a stay to justify requiring a litigant in one cause to stand aside while a litigant in another action settles the rule of law that will define the rights of both, Judge Loughlin exercised his discretion in awarding a stay. In so doing, however, he clearly set forth the key issues to be considered in such actions as outlined in *Chin-*

**1318** ■

tala v. Diamond Reo Trucks, Inc., 393 F.Supp. 1392, 1393 (E.D.Pa.1975). These considerations include (1) comity, (2) promotion of judicial efficiency, (3) adequacy and extent of relief available in the alternative forum, (4) identity of the parties and of the issues in both actions, (5) likelihood of prompt disposition in the alternative forum, (6) convenience of the parties, counsel, and witnesses, and (7) possible prejudice to a party as a result of the stay.

■ In the instant case, not only do the parties lack identity and similar issues, but it now appears that the likelihood of prompt disposition in the alternative forum is doubtful prior to April of 1981. It appears that new counsel has recently entered the litigation in behalf of the defendant Black–Clawson Company and will require more time to prepare than will be available if the case goes forward in December or January. Moreover, there is possible prejudice to TMB herein and, in light of the fact that the Court's rulings in this Opinion have considerably narrowed the issues and a trial date is now scheduled for November 1980, it appears that convenience of all parties would be better served by proceeding as scheduled herein. The motion for stay is accordingly denied.

### CONCLUSION

For the reasons hereinabove set forth, the motion to vacate the previously ordered entry of summary judgment on Count VII of the complaint is vacated herewith, the plaintiff's motion for summary judgment as to Count VII is herewith denied, the defendant's motion for summary judgment as to Counts I, II, and III of the complaint is granted, the defendant's motion for summary judgment as to Counts IV, V, and VI of the complaint is denied. Inasmuch as the order herein adjudicates fewer than all of the claims of the parties, judgment entered in accordance therewith is not final, Rule 54(b), Federal Rules of Civil Procedure, and trial shall go forward as scheduled on Counts IV, V, VI, and VII of the complaint.

SO ORDERED.